325 So.2d 14 (1975)
Donald Quincy DEAN, Appellant,
v.
STATE of Florida, Appellee.
No. V-165.
District Court of Appeal of Florida, First District.
August 28, 1975.
*15 Frank T. Cannon, Jacksonville, for appellant.
Robert L. Shevin, Atty. Gen., and Carolyn M. Snurkowski, Asst. Atty. Gen., for appellee.
McCORD, Judge.
This is an appeal from judgment and sentence of appellant for first degree murder.
The state's theory (which was evidently believed by the jury) was that appellant hired one Wayne Rowell to kill Stephen Owen Glover, the deceased. Rowell testified for the state after pleading guilty to second degree murder with an agreed 15 year sentence. The state's evidence showed that the deceased was killed at his trailer home on September 24, 1973, between 11:30 and 12 p.m. by a shotgun blast. At the scene at the time of the homicide were the deceased, his wife, Geraldine, their infant child, and Geraldine's brother, Jimmy Johnson. Mrs. Geraldine Glover testified that she met appellant in 1970; that subsequently she had a love affair with him, while married to the decedent, and had been involved with appellant in the sale of drugs and stolen goods; that she broke off the affair because of appellant's threats; that appellant had threatened to kill her, her husband and her son because she knew too much about appellant's illegal activities; that appellant had said he would be "sitting in church" when they were killed; that the tires on her car had previously been slashed; that drugs had been planted in her car; and that appellant had previously attempted to have her declared incompetent. She further testified that on the night of the shooting she arrived at 9 p.m. to find her husband angry because appellant had called and threatened to kill him. She and her husband and small son were sleeping in the same bed in the back bedroom of the trailer when the shooting occurred. She testified that during the night she was awakened by shots and looked out the window and saw a Pontiac automobile with a black top and maroon bottom; that she noticed her husband was hit and called the police. She further testified that she did not know Wayne Rowell. Her testimony as to the events on the night of the shooting were corroborated by the testimony of her brother, who was sleeping in another bedroom in the trailer. The evidence showed that the cause of death was a single shotgun or gunshot wound in the head of the decedent. A 3/8-inch ball bearing was removed from his brain.
Rowell testified that he had known appellant approximately one year; that appellant told him that Geraldine had kept records for him concerning drug transactions; that previous to the homicide appellant had cancelled a debt of Rowell's because he had cut Geraldine's tires at appellant's request; that he had also previously planted a paper sack in her car at appellant's request and two weeks prior to the homicide he had harassed Geraldine by firing a shotgun loaded with birdshot at her trailer at appellant's request. He further testified that on the afternoon of the homicide, he got off work at approximately 4 p.m. and stopped and picked up a six pack of beer and started drinking; that he went home and then left and joined up with a couple of his buddies and they went to a bar where they drank until approximately *16 9 or 9:30 and then left and went to a friend's house and had a few more beers and then about 10:00 he borrowed a black 1962 Pontiac automobile from one of his friends and went home. He testified that upon arrival his wife told him that appellant had been over and wanted to see him before 12:00 so he went over to a Miss North's house where appellant was staying; that he pulled up in the yard and appellant came out with an unplugged shotgun that was fully loaded with five shots; that appellant gave him a $50 check and told him to go shoot the back out of the trailer that he had shot previously; that he told him there wasn't anybody home and to "unload" the gun in the back of the trailer and not to come back or bring the shotgun back to him. He testified that he went back home and gave his wife the check and then got in the car and drove out past the trailer; that he turned around to make sure there wasn't anybody at home; that no lights were on and he didn't see a car; that he stopped in front of the driveway and fired five times into the back of the trailer; that he then drove off and went to Dale's Lounge, where he had a beer; that he did not know either Mr. or Mrs. Glover and had never met them; that later appellant instructed him to say that Geraldine had a contract out on her husband's life and that she would pay $25,000.
Mary Francis Rowell, wife of Wayne Rowell, testified to the arrival of appellant at their home the night of the shooting and the comings and goings of her husband.
Mary Ellen Fehr testified that she had known appellant for approximately a year and a half and had purchased a pound of pot from him; that Geraldine was present during the transaction and took her check for the pot; that following the initial sale, she bought drugs frequently from appellant; that at appellant's request she wrote a letter to Stephen Glover and enclosed nude pictures of Geraldine which were supplied by appellant. When asked why she did this, Miss Fehr said appellant told her he had Mafia connections and would help get her and Bill Williams into the Mafia; that appellant told her that Geraldine was a "narc" agent and "if he were to wake up one morning and find them dead, there would be $500 deposited into somebody's account where, it was due"; that mention of killing Geraldine was again made to Miss Fehr by appellant; that appellant wanted to know if she had found someone to make a bomb. William L. Williams, Jr., corroborated testimony of Miss Fehr and stated that appellant talked to him about blowing up a trailer and a scheme that was concocted to bomb the trailer. He also testified about making an affidavit at the request of appellant as to Geraldine's mental state and her desire to have her husband killed.
Donald Raymond Church, an acquaintance of appellant, testified to an incident when he and some friends were at appellant's house. He testified that appellant "mentioned that he wanted this girl, Geraldine Glover, killed and wanted to know if any of us would do it for him and we talked about it and then he got in the car with us and we rode over to where Mrs. Glover lived and he showed us the house and everything." Church further testified: "He said that if she was killed or done away with that he would pay Bill Williams $500 and let him give it to whoever you know, done the job."
Appellant testified that he had nothing to do with the death of the victim; that he was being framed because he had provided information to the police that led to the arrest of friends of some of the witnesses. He testified that during his affair with Geraldine she had told him that she had Stephen well insured and indicated that there was $25,000 insurance on Stephen which she would split with him if he would kill her husband; that he knew where Stephen went hunting and she suggested that he go out there and kill him. He testified that the $50 he paid Rowell was for fixing his air compressor; that Rowell had come *17 over to where he was staying the night of the shooting and wanted to collect for fixing it; that he paid him and told him his brother would pick up the compressor later. (Rowell had testified that Dean had loaned him the air compressor to use and not to repair; that he had been using it and had not repaired it.) Appellant testified that he had been having an affair with Rowell's wife; that when Rowell saw him the night of the shooting Rowell had been drinking and accused him of going with his wife; that Rowell told him he didn't want him to go over to his house anymore. Appellant testified that the shotgun which was admitted into evidence as the murder weapon was one that he had swapped to Rowell on a television set; that he knew nothing about the tires on Geraldine's car being cut; knew nothing about the drugs that were found in Geraldine's car; did not know why Glover was killed and had no part with anyone in the killing.
Rowell, on cross examination, admitted having given previous sworn statements which were inconsistent and in conflict with his testimony; that in the statements he had said he had done the shooting as a result of barroom talk; that he had heard there was a bounty out on Mr. Glover; that he implicated Dean because, by testifying against appellant, he would be given "immunity or probation or something of that nature" and would receive $1,000 from the police department, $10,000 from the family, and $12,000 from the insurance policy for killing Glover and implicating appellant. The foregoing was contained in a statement Rowell gave to appellant's present attorney, Frank T. Cannon, and his testimony at the trial was to the effect that he thought at the time that Mr. Cannon was being furnished by appellant to represent him (Rowell). He testified that he later discovered that he had been "double-crossed"  that he had not been furnished an attorney. He testified that the previous statements were untrue and in attempting to demonstrate that they were untrue, he testified that he had been given three lie detector tests. His testimony regarding the lie detector tests is as follows (upon questioning by the assistant state attorney):
"Q Mr. Rowell, you made a statement in the sworn statement and you made statements in here today. Which day were you telling the truth?
A I beg your pardon?
Q When were you telling the truth, when you testified in court today or those statements that you made?
A Today. Everything I have told today can be verified by the three lie detector tests I took."
Defense counsel then moved for a mistrial because of the witness's testimony that the truth of his testimony from the witness stand could be verified by the three lie detector tests he took. The assistant state attorney moved to strike the statement and requested that the court give the jury a cautionary instruction regarding his reference to the lie detector tests. Motion for mistrial was denied but the trial court gave a cautionary instruction in which it reviewed the testimony given by the witness regarding the lie detector tests, reminded the jurors of their oaths and instructed them to disregard the comments of the witness regarding the lie detector tests. The court further instructed them that there was no competent evidence before the jury that he had even taken a lie detector test and that any reference made to lie detectors was totally inadmissible and should not be considered in any manner in arriving at any phase of their verdict; that "the reason lie detectors are not admissible is because they are so unreliable and unfruitful."
The failure of the trial judge to grant appellant's motion for a mistrial is one of appellant's primary grounds upon which he seeks reversal on this appeal. Evidence relating to a lie detector test is *18 inadmissible in the courts of this state. Kaminski v. State, Fla., 63 So.2d 339 (1952); Johnson v. State, Fla.App. (2d), 166 So.2d 798 (1964); State v. Brown, Fla.App. (2d), 177 So.2d 532 (1965); Anderson v. State, Fla., 241 So.2d 390 (1970); State v. Curtis, Fla.App. (3d), 281 So.2d 514 (1973), and Sullivan v. State, Fla., 303 So.2d 632 (1974). In several instances a mere reference to a lie detector test without any reference to the result thereof, although inadmissible, has been held not to constitute reversible error where a cautionary instruction is given by the Court. In Johnson v. State, supra, the District Court of Appeal, Second District, said:
"On the basis of an analysis of the cases hereinbefore discussed we conclude that while neither the results of a lie detector examination nor testimony which indirectly or inferentially apprises a jury of the results of a lie detector examination is admissible into evidence, the mere fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial if no inference as to the result is raised or if any inferences that might be raised as to the result are not prejudicial. The determination should not, of course, encourage attempts to introduce evidence concerning lie detectors. As is clear from the cited cases, such evidence is liable to be prejudicial and should be admitted only when clearly relevant and unmistakably nonprejudicial."
In Kaminski v. State, supra, the original case in Florida as to the admissibility of lie detector tests, the Supreme Court said:
"We find, without a single exception, that every court of last resort that has been called upon to decide the question has ruled that results obtained from the so-called lie detector test are not admissible as evidence."
......
"It was not fair to place the defendants in the entrapped position that required them at their peril either to pursue the inquiry as to the nature of the results of the test or to be damned by the adverse impressions which naturally would be expected to flow from their failure to do so."
In the recent case, Sullivan v. State, supra, the Supreme Court reiterated that the results of lie detector tests are not admissible in evidence. In some ways that case is similar to the case sub judice, but it differs in a very material respect. There, an accomplice testifying for the state, upon being questioned by the defense, admitted that his sentence would depend on how his testimony turned out. On redirect examination, the state asked the defendant, "When you said that your sentence is going to be determined by your testimony and would you explain to the jury what you meant?" to which the witness answered: "That I would have to have taken a polygraph test and passed it." Defense counsel moved for a mistrial which was denied. The trial judge offered to instruct the jury to disregard the reference to the polygraph test but defense counsel declined the offer. The Supreme Court in affirming the conviction stated:
"We also note that the witness never referred to the actual results of the polygraph test in any manner, and that the only mention of a polygraph test was the one answer discussed above. It all becomes too tenuous to support harmful error that would likely have produced a different result if not present."
In the case sub judice, the witness testified to the result of the three lie detector tests. In Sullivan the Supreme Court pointed out that the witness had not testified that he had taken a lie detector test. In distinguishing Sullivan from its previous opinion in Kaminski, the Supreme Court said:
"In Kaminski, the witness clearly informed the jury that he had taken a polygraph test, defense counsel carefully attempted to cure the error at the trial court level, and the State's case depended *19 entirely upon the testimony of the witness, whose credibility had been seriously shaken both by cross-examination and by the testimony of other State witnesses. None of these factors is present in the instant cause, McLaughlin's testimony never having been seriously shaken, a large body of other evidence of appellant's guilt having been introduced, and, most importantly McLaughlin never clearly stating that he had already taken the polygraph test. Indeed, the one ambiguous answer noted above is the sole reference to the polygraph."
The case sub judice is analagous to Kaminski rather than to Sullivan. Here, as in Kaminski, the witness clearly indicated to the jury that he had taken and passed not one but three polygraph tests which supported his testimony. While there was other evidence tending to show appellant's guilt, this was a key witness for the state. He was the only witness who directly connected appellant to the homicide. His credibility had been seriously shaken on cross-examination by his own previous sworn statement and by appellant's testimony. It was extremely important that the jury weigh the believability of his testimony in the light of admissible rather than inadmissible evidence. While the cautionary instruction of the trial court was thorough, it could not offset the damaging and prejudicial effect of the witness's testimony that the version he was then testifying to was true because it was supported by three lie detector tests which had been given to him. It was unfortunate that he had not been instructed by the State prior to testifying that he must make no comment regarding his having taken lie detector tests, or, if he was so instructed, it was regrettable that the seriousness of a failure by him to follow such instruction was not impressed upon him. This having been a lengthy trial, the occurrence is particularly unfortunate, but a defendant is entitled to a fair trial in which he is not convicted upon inadmissible, prejudicial testimony. We cannot say the error was harmless. The motion of defendant for a mistrial should have been granted.
Appellant alleges several additional points as error in the trial below. He contends that when the jury returned to the courtroom during their deliberations and requested to be reinstructed on first, second and third degree murder and when the trial court so instructed them and added the manslaughter instruction, it erred in not also reinstructing the jury on justifiable and excusable homicide. Contained in the manslaughter instruction is the statement that it is "the killing of a human being by the act, procurement or culpable negligence of another in cases where such killing shall not be justifiable or excusable homicide or murder." We do not consider that such reinstruction on justifiable and excusable homicide was necessary in this instance. The jury had not asked for additional instructions on manslaughter. The judge, with the agreement of counsel for both parties and without any objection from appellant as to the content of such instruction, gratuitously gave the manslaughter instruction to them. In addition, the judge in his previous instructions had fully defined justifiable and excusable homicide. In the absence of a request from the jury or from the parties for a repeat of such definitions, it was not error not to give them. In any event, however, even if such had been technical error, it was cured by the jury's verdict. It is illogical to say that because the judge did not redefine justifiable and excusable homicide as not constituting the crime of manslaughter, such would vitiate a verdict of first degree murder. Such could have had no bearing upon the jury having reached a verdict of first degree murder.
Appellant also contends that the trial court erred in a ruling made in the course of the trial that he would not allow evidence of witness Rowell's previous statement to go in evidence. The court freely permitted examination of Rowell on the statement and since Rowell admitted *20 the previous inconsistent statement, it did not become necessary or permissible for the statement itself to be put in evidence as an exhibit.
We have considered the other points raised by appellant and find them to be without merit.
Reversed for a new trial.
BOYER, C.J., and RAWLS, J., concur.