[No. 8864-2-III. Division Three. June 20, 1989.]

INDUSTRIAL INDEMNITY COMPANY OF THE NORTHWEST, INC., *Appellant,* v. DAVID E. KALLEVIG, ET AL, *Respondents.*

*Douglas F. Foley, R. Daniel Lindahl,* and *Bullivant, Houser,* for appellant.

*Richard Johnson, Velikanje, Moore & Shore,* and *Hugh Spall,* for respondents.

THOMPSON, C.J.—Industrial Indemnity Company of the Northwest, Inc. (IIC) sought a declaratory judgment that David Kallevig intentionally caused a fire in a restaurant owned by him and insured by IIC. The Kallevigs counterclaimed for breach of contract and consumer protection violations. Robert and Joan Kraft intervened. IIC appeals (1) a judgment of $248,451 on a jury verdict awarding Mr. Kallevig and his wife damages caused by the fire and by IIC's failure to handle their claim in good faith, and (2) a

summary judgment that the Krafts are additional loss payees of the insurance policy issued by IIC to the Kallevigs. We affirm.

At the trial, employees Diana Smiley and Chuck Smith testified that they closed the Peachtree Restaurant at approximately 8 p.m. on the evening of January 27, 1986. Mr. Smith stated that before leaving he checked to make sure the overhead light in the food preparation area was turned off. The switch for this light also controls the outlet which is used for a hotplate. It is not necessary to turn the control on the hotplate to the "off" position; rather, the power for the hotplate is interrupted when the wall switch is turned off.

Mr. Kallevig testified that he stopped by the restaurant at approximately 8:15 p.m., counted the money from the till, and placed it in the floor safe. He stated he did not go into the food preparation area. Mr. Kallevig left the restaurant at about 8:30 p.m. At 9:05 p.m., the Yakima Fire Department responded to a fire at the restaurant.

Steven Scott of the Yakima Fire Department investigated the fire. In his opinion, the fire originated below the food preparation table. There was no evidence of flammable liquid. He determined that the hotplate or the outlet were the two possible sources of ignition.

Mr. Scott has had no formal training in electrical wiring. He took both the hotplate and the outlet box to George Picatti, an electrical engineer. Mr. Picatti found no fault or malfunction in either device, but explained he "was not allowed" to take the outlet box apart completely; he talked to Mr. Scott only about 20 minutes.

Mr. Scott also told the jury he found a late notice from Pacific Power and Light in the restaurant garbage can. He investigated courthouse records and discovered the Department of Labor and Industries had filed a lien against Mr. Kallevig the day of the fire. Based on Mr. Smith's statement that the light was off when he left the restaurant; his own determination that either the outlet or the hotplate was the source of ignition; Mr. Picatti's opinion that neither

malfunctioned; and evidence that the business was experiencing financial difficulties, Mr. Scott came to the conclusion the fire was arson and Mr. Kallevig had the opportunity and the motive to set it.

On January 29, 1986, IIC contacted Gerald Anderson, a self–employed fire investigator. He visited the fire scene, and spoke with Mr. Scott and Mr. Kallevig. He agreed with Mr. Scott that the fire started near the floor. Like Mr. Picatti, he saw no evidence of an electrical malfunction. He also concluded the fire was intentionally caused.

John Fabian is a claims representative for IIC. By early February, he had been informed of the conclusions of both Mr. Scott and Mr. Anderson regarding the fire. About this same time, Mr. Fabian contacted Henry Smilowicz, a certified public accountant, to review Mr. Kallevig's financial records. Mr. Smilowicz concluded Mr. Kallevig was unable to pay his bills at the time of the fire.

On February 21, 1986, IIC received Mr. Kallevig's proof of loss. Both before and after filing the proof of loss, Mr. Kallevig unsuccessfully sought advances from IIC to meet current expenses and to stay in business. IIC's response was simply that its investigation was ongoing. On May 2, 1986, Mr. Fabian denied the claim. On May 5, 1986, IIC filed this action for declaratory relief. The Kallevigs answered, counterclaiming for damages for IIC's alleged breach of contract and violation of the Consumer Protection Act (CPA).

In preparation for trial, the Kallevigs obtained the opinions of Richard Becker, an electrical engineer, and John Philbin, a fire protection consultant, regarding the cause of the fire. From their on–site investigations and testing, both men concluded that the outlet had malfunctioned *before* the employees left that evening; that the malfunction tripped the breaker causing the light in the food preparation area to go out, although the switch remained in the "on" position; and that the malfunction started a smoldering fire inside the wall behind the outlet. Mr. Philbin pointed out that all 10 fire fighters who responded to the scene reported no visible flame until they cut into the wall

and the ceiling. He explained that the V–shaped burn under the food preparation table was a secondary fire in the dishwasher tray stored there. The trays held plastic glasses which burn quickly at a high temperature.

On this evidence, the jury found in favor of the Kallevigs, and awarded them a total of $128,104.69 for breach of contract and $20,000 for the CPA violation. In its judgment, the court also awarded the Kallevigs attorney fees of $64,442, an additional $10,000 in increased damages under the CPA, prejudgment interest of $25,344.20, and taxable costs of $560.20, for a total judgment of $248,451.09.

First, IIC contends the court erred when it denied its motions for a directed verdict and for a judgment n.o.v. on the Kallevigs' CPA claim.

 A court should grant a motion for a directed verdict or a motion for a judgment n.o.v. only if it can say, as a matter of law, that the evidence or reasonable inferences, when viewed in the light most favorable to the nonmoving party, cannot sustain a verdict for the party opposing the motion. *Cowsert v. Crowley Maritime Corp.,* 101 Wn.2d 402, 405, 680 P.2d 46 (1984).

 To sustain a verdict that an insurer violated the CPA, there must be evidence the insurer acted without reasonable justification in handling a claim by its insured. *Villella v. Public Employees Mut. Ins. Co.,* 106 Wn.2d 806, 821, 725 P.2d 957 (1986). Conversely, "[a] denial of coverage, although incorrect, based on reasonable conduct of the insurer does not constitute an unfair trade practice." *Villella,* at 821.

In *Safeco Ins. Co. v. JMG Restaurants, Inc.,* 37 Wn. App. 1, 680 P.2d 409 (1984), the insured alleged its insurer acted in bad faith when it filed a declaratory judgment action seeking a declaration of nonliability under a fire loss policy. The insurer suspected the fire was intentionally set by the insured. In reviewing the trial court's denial of the insurer's motion for a directed verdict on the CPA claim, the court noted at page 14:

> There is no doubt that there was considerable evidence in [the insurer's] favor. That is not the issue. . . . The issue is whether there was evidence from which a reasonable person could conclude that [the insurer] . . . acted without reasonable justification in the handling of [the] claim.

As in this case, the insurer in *Safeco* relied heavily on the insured's apparent motive and opportunity to set the fire. *Safeco,* at 14–15. But the court held the jury could have found that a reasonable and objective person would have recognized the evidence did not rise above the level of suspicion and conjecture, and that the insurer started the declaratory judgment action for purposes of delay without conducting a sufficient investigation. *Safeco,* at 15.

Here, Mr. Fabian, the claims representative, stated he denied the claim based upon the evidence of Mr. Kallevig's finances, the investigations by Mr. Scott and Mr. Anderson, and the evidence the light was off when the employees left the restaurant the night of the fire. Mr. Scott and Mr. Anderson both testified they came to the conclusion the fire was arson even though there was no evidence at the scene of any fuel used to start the fire. They relied on Mr. Picatti, an electrical engineer, to rule out an electrical malfunction as the cause of the fire. But Mr. Picatti never visited the fire scene, and testified he spoke to Mr. Scott for only 20 minutes and had no opportunity to completely dismantle the outlet box to examine its interior. Throughout the investigation, Mr. Kallevig maintained he did not cause the fire. A jury could find on this evidence that a reasonable insurer would have conducted a more extensive investigation and that IIC acted without reasonable justification in denying Mr. Kallevig's claim.[1]

---

[1]IIC relies on the rule that denial of a claim due to a debatable question of coverage is not bad faith giving rise to a CPA violation. *Felice v. St. Paul Fire & Marine Ins. Co.,* 42 Wn. App. 352, 361, 711 P.2d 1066 (1985), *review denied,* 105 Wn.2d 1014 (1986). It is clear the court in *Felice* used the term "debatable" to mean "reasonable". The court states: "We have found St. Paul denied coverage based on a reasonable interpretation of the policy, thus it cannot be said the denial was in bad faith". *Felice,* at 361.

There was sufficient evidence to support the jury's verdict. The court properly denied IIC's motions for directed verdict and judgment n.o.v.

Second, IIC asserts it was error for the court to instruct the jury that the Washington Administrative Code defines certain conduct by insurers as unfair or deceptive acts or practices. The instruction was given in the language of WAC 284–30–330, and stated:

### NO. 12

Regulations of the State of Washington, promulgated by the State Insurance Commissioner, contained in WAC 284–30–330, prohibit insurance companies from engaging in acts or practices in the conduct of the business of insurance which are unfair or deceptive. This regulation provides, in pertinent part, that:

"The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

. . .

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

(4) Refusing to pay claims without conducting a reasonable investigation.

(5) Failing to affirm or deny coverage of claims within a reasonable time after Proof of Loss statements have been completed.

(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

(7) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.

. . .

(11) Delaying the investigation or payment of claims by requiring an insured, . . . to submit a preliminary claim report and then requiring subsequent

submissions which contain substantially the same information.

. . .

(13) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.[2]

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 784–85, 719 P.2d 531 (1986) held that to prevail in an action brought under RCW 19.86.090 of the CPA, a plaintiff must establish the existence of five distinct elements: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which impacts the public interest; (4) injury to the plaintiff in his or her business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered. "A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." *Hangman Ridge,* at 786.

At issue is whether proof of a single violation of the WAC regulations meets *Hangman Ridge*'s requirement for establishing a per se unfair trade practice. IIC argues "no" and relies on WAC 284–30–300, which states the purpose of WAC 284–30–300 through 284–30–410 "is to define certain minimum standards which, *if violated with such frequency as to indicate a general business practice,* will be deemed to constitute unfair claims settlement practices." (Italics ours.)

The Supreme Court has twice declined to decide whether a single violation of WAC 284–30–330 amounts to a violation of RCW 48.30.010(1),[3] and is thereby a per se unfair

---

[2]Instruction 3, to which IIC also assigns error, sets forth the Kallevigs' allegations as to specific violations of the CPA by IIC.

[3]RCW 48.30.010 provides:

"(1) No person engaged in the business of insurance shall engage in unfair methods of competition or in unfair or deceptive acts or practices in the conduct

trade practice. *See Villella v. Public Employees Mut. Ins. Co., supra* at 820; *Federated Am. Ins. Co. v. Strong,* 102 Wn.2d 665, 676, 689 P.2d 68 (1984).[4] In each case the court found it unnecessary to decide the issue. However, *Escalante v. Sentry Ins. Co.,* 49 Wn. App. 375, 743 P.2d 832 (1987), *review denied,* 109 Wn.2d 1025 (1988) squarely addressed this question, deciding that an action may be brought for violation of the CPA based on isolated violations of the Insurance Commissioner's Washington Administrative Code regulations. The court reasoned:

> These regulations appear to be intended to provide standards to guide the Insurance Commissioner in regulating the ongoing conduct of insurance companies. . . . There is no clearly expressed intent in RCW 48.30.010 or the WAC regulations to provide private causes of action for isolated violations of the regulations.
>
> However, in RCW 19.86.170 of the CPA the Legislature stated that
>
>> actions and transactions prohibited or regulated under the laws administered by the insurance commissioner *shall be subject to the provisions of RCW 19.86.020 and all sections of chapter 216, Laws of 1961 and*

_____

of such business as such methods, acts, or practices are defined pursuant to subsection (2) of this section.

"(2) In addition to such unfair methods and unfair or deceptive acts or practices as are expressly defined and prohibited by this code, the commissioner may from time to time by regulation promulgated pursuant to chapter 34.04 RCW, define other methods of competition and other acts and practices in the conduct of such business reasonably found by the commissioner to be unfair or deceptive."

[4]*See also Mutual of Enumclaw Ins. Co. v. Cox,* 110 Wn.2d 643, 757 P.2d 499 (1988), in which the court held the insured's fraud precluded his recovery for damages for the insurer's CPA violation based on its bad faith and failure to comply with Washington Administrative Code provisions. The opinion notes:

> [L]egal mechanisms exist to punish insurers guilty of CPA violations since insurers are subject to the enforcement powers of the State Insurance Commissioner. We consider this regulation by the Insurance Commissioner to be an adequate deterrence against bad faith by insurance companies. We need not further punish [the insurer] when to do so would provide a windfall to one guilty of fraud.

*Cox,* at 652. Fraud on the part of the insured is not an issue here and distinguishes the facts of this case from those of *Cox.*

*chapter 19.86 RCW which provide for the implementation and enforcement of RCW 19.86.020* except that nothing required or permitted to be done pursuant to Title 48 RCW shall be construed to be a violation of RCW 19.86.020: . . .

Since this statute declares that "actions . . . prohibited *or regulated* " (italics ours) by RCW Title 48 (the insurance code) are subject to RCW 19.86.020 (declaring unfair or deceptive acts or practices unlawful) and all sections of RCW 19.86, and since RCW 19.86.090 clearly creates a private right of action for violations of RCW 19.86.020, it follows that violations of the WAC regulations set forth in WAC 284–30 (which are promulgated pursuant to RCW 48.30.010(2)) create a private cause of action in an insured under the CPA. Therefore, appellants may bring an action for violations of the CPA based on alleged violations of the WAC regulations at issue in this case.

(Citations omitted.) *Escalante,* at 389–90.

*Escalante*'s reasoning was followed in *Evergreen Int'l, Inc. v. American Cas. Co.,* 52 Wn. App. 548, 761 P.2d 964 (1988). *Evergreen* held at page 558:

The requirement of frequency of violation does not mean that an act is not unfair or deceptive if proven to have been committed against only one insured. The goals served by the Insurance Commissioner's enforcement of the regulations differ from those served under the CPA. The Insurance Commissioner's aim is a well regulated insurance industry. *Tank v. State Farm Fire & Cas. Co.,* 105 Wn.2d 381, 395, 715 P.2d 1133 (1986). Treating isolated unfair acts differently from frequent violations is consistent with the Insurance Commissioner's purpose. On the other hand, the CPA is designed to protect the public and foster fair and honest competition, and is to be liberally construed to serve that end. RCW 19.86.920. Private disputes are actionable under the CPA. RCW 19.86.090. We conclude an isolated unfair or deceptive act which meets the description of prohibited conduct as contained in WAC 284–30–330 constitutes a per se unfair trade practice under the rules of *Hangman Ridge.*

(Footnote omitted.)

We agree with the analysis in *Escalante* and *Evergreen* and hold the court properly instructed the jury that the Washington Administrative Code defined the specified conduct by insurers as unfair and deceptive acts or practices.[5]

Third, IIC claims the court should have admitted evidence that Mr. Kallevig refused to take a polygraph. IIC reasons that all information considered by it in denying the claim is relevant to the issue of whether it acted reasonably.

In *State v. Descoteaux*, 94 Wn.2d 31, 38–39, 614 P.2d 179 (1980), *overruled on other grounds in State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982), the court noted:

> The well established rule is that the results of a polygraph examination are not admissible absent a stipulation by both parties. . . .
>
> Here, however, defendant never took the polygraph test and therefore no results were introduced into evidence. . . . However, ". . . evidence [that a person refused to take such a test] is liable to be prejudicial and should be admitted only when clearly relevant and unmistakably nonprejudicial.'" *Dean v. State*, [325 So. 2d 14, 18 (Fla. Dist. Ct. App. 1975), *cert. denied*, 333 So. 2d 465 (1976)], quoting *Johnson v. State*, 166 So. 2d 798, 805 (Fla. Dist. Ct. App. 1964).

(Citations omitted.) *Descoteaux* held the State's inquiry regarding the polygraph was improper as its prejudicial effect outweighed any probative value. *Descoteaux*, at 39; ER 403.[6]

IIC relies on *Moskos v. National Ben Franklin Ins. Co.*, 60 Ill. App. 3d 130, 376 N.E.2d 388 (1978). In that insurance bad faith action, the court upheld a trial court's consideration of evidence that during a polygraph examination an insured had intentionally behaved in a manner that

---

[5]*Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 715 P.2d 1133 (1986), cited by IIC, is not helpful here. *Tank* held at page 393 that *third party claimants* have no cause of action under the regulations. The Kallevigs are *first party claimants*.

[6]Contrast *State v. Terrovona*, 105 Wn.2d 632, 652–53, 716 P.2d 295 (1986) (inadvertent admission of polygraph that raises no inferences regarding veracity is not prejudicial).

interfered with the tester's ability to secure readings. *Moskos,* 376 N.E.2d at 390. The court held at page 134:

> [T]he results of the examination were presented to the circuit court, *not on the issue of the plaintiff's responsibility for the fire, but on the question of the defendants' state of mind*—that is, on whether the defendants, upon consideration of the results of that test, had a reasonable basis for concluding that the plaintiff was the arsonist. Whether the defendants were correct or incorrect, and whether the test results were accurate or inaccurate is irrelevant. The point is that the polygraph evidence was relevant only to establish that the defendants did not act in bad faith in contending that the plaintiff committed arson. Accordingly, *it was not error to consider this evidence in passing upon the motion for summary judgment.*

(Italics ours.) In *Moskos,* the question of whether the insured had committed arson had been decided in favor of the insured in a separate trial. Subsequently, the bad faith action was determined by the court on a motion for summary judgment.

 *Lynch v. Mid–America Fire & Marine Ins. Co.,* 94 Ill. App. 3d 21, 418 N.E.2d 421, 429 (1981) is closer to the situation presented here. In *Lynch,* the court upheld a trial court's decision to exclude evidence of the results of a polygraph examination. The court stated at page 30: "As the evidence would have been likely to have been improperly considered by the jury as to the arson policy defense despite any limiting instruction, the trial court did not err in balancing the prejudice against the probative value and denying admission." The same risk was present here. The jury was asked to determine both the insurance company's charge that Mr. Kallevig had committed arson and the Kallevigs' action for bad faith. While the polygraph information may have been probative of IIC's state of mind in denying the Kallevigs' claim, the risk of the jury considering it as evidence that Mr. Kallevig committed arson was so great that the trial court properly excluded it. Under *Descoteaux,* the evidence, although relevant, is not so

"unmistakably nonprejudicial" so as to be admissible. *See also* ER 403; Annot., *Physiological or Psychological Truth and Deception Tests,* 23 A.L.R.2d 1306, § 2, at 1308 (1952). The court did not err in excluding it.

IIC's remaining assignments of error are not persuasive. Its exception during trial to instruction 18 on damages did not apprise the court of the precise points of law involved, as required by CR 51(f). Therefore, those points will not be considered on appeal. *Stewart v. State,* 92 Wn.2d 285, 298, 597 P.2d 101 (1979). IIC has not shown the court abused its discretion in admitting into evidence a videotape of an experiment conducted by one of Kallevigs' expert witnesses. *Jenkins v. Snohomish Cy. PUD 1,* 105 Wn.2d 99, 107, 713 P.2d 79 (1986). We cannot say no reasonable person would have admitted the test. Any potential the test may have had to mislead was minimized when the court permitted IIC's counsel to point out the differences in conditions. We find no error.

Finally, we need not address IIC's contention that the court erred when it held as a matter of law the Krafts were loss payees of the insurance policy. Counsel for IIC admitted in oral argument before this court that the Krafts' status as loss payees was material only if the Kallevigs' claim under the policy was defeated by proof Mr. Kallevig had committed arson. IIC has not appealed the jury verdict which rejected its arson defense. The damages it must pay for breach of contract are the same regardless of the Krafts' status. The Krafts also ask for attorney fees on appeal, but cite no authority for such an award. We therefore refuse to award them fees.

The Kallevigs have submitted an affidavit and otherwise complied with the provisions of RAP 18.1 in support of their claim for attorney fees on appeal. On the authority of the CPA, we award them reasonable fees on appeal of $19,664. *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 601–02, 675 P.2d 193 (1983); *Evergreen,* at 561.

Affirmed.

Munson and Shields, JJ., concur.

Review granted at 113 Wn.2d 1016 (1989).