[No. 56389-6. En Banc. June 14, 1990.]

INDUSTRIAL INDEMNITY COMPANY OF THE NORTHWEST, INC., *Petitioner*, v. DAVID E. KALLEVIG, ET AL, *Respondents*.

---

*Bullivant, Houser, Bailey, Pendergrass & Hoffman,* by *R. Daniel Lindahl,* for petitioner.

*Velikanje, Moore & Shore, Inc., P.S.,* by *Richard R. Johnson,* for respondents Kallevig.

*William R. Hickman, Neil G. Dorfman,* and *Pamela A. Okano* on behalf of PEMCO, Safeco, State Farm Fire and Casualty, Mutual of Enumclaw, Grange, and Unigard Group insurance companies, amici curiae for petitioner.

*Bryan P. Harnetiaux, Robert H. Whaley,* and *Mary Ellen Gaffney–Brown* on behalf of Washington State Trial Lawyers Association, amici curiae for respondents.

DURHAM, J.—Industrial Indemnity Company of the Northwest, Inc. (Industrial Indemnity) appeals a decision of the Court of Appeals which affirmed a jury verdict against Industrial Indemnity for breach of insurance contract and violations of the Consumer Protection Act (CPA), RCW 19.86. Finding no error, we affirm.

This case originated with Industrial Indemnity's complaint for declaratory judgment that David E. Kallevig intentionally caused a fire which destroyed the Peach Tree Restaurant in Yakima, Washington. The restaurant was owned and operated by David and Judith L. Kallevig and insured under a policy issued by Industrial Indemnity.[1]

On the night of January 27, 1986, the Peach Tree Restaurant was destroyed by fire. At 8 p.m. that evening, employees Chuck Smith and Diana Kay Smiley closed the restaurant. Both Smith and Smiley testified that they were certain that Smith turned off the two switches in the food preparation area when they closed the restaurant. One switch powered a light above the dishwasher. The other switch powered both a fluorescent light located above the food preparation table and a wall outlet box. The wall outlet box was located about 6 inches above the food preparation table.[2] There was testimony that the employees occasionally noticed that the wall outlet box would be hot.

Smith testified that the restaurant occasionally used a hot plate. When in use, the hot plate would be placed on the food preparation table and plugged into the wall outlet box. When not in use, the hot plate was stored under the table on a shelf. Smith provided contradictory testimony as to whether he believed the hot plate had been used on the day of the fire. He also testified that occasionally he would forget to turn off the hot plate when he closed the restaurant.

At approximately 8:10 to 8:15 p.m., David Kallevig arrived at the restaurant. He counted the money, put it into the floor safe, and left the restaurant at approximately

[1]The policy, issued September 1, 1985, provided comprehensive coverage for the restaurant building up to $100,000, comprehensive coverage for the business contents up to $25,000, and coverage up to $18,000 for lost income following an insurable loss.

[2]The wall outlet box was not inset into the wall; rather, it was mounted up against the wall. The outlet box had been added during repair work following an earlier accident in which a pickup collided with the restaurant wall.

8:30 p.m. This was his usual practice. He testified that he did not go into the food preparation room or start any fires.

At approximately 9:05 p.m., the Yakima Fire Department received a report that the Peach Tree Restaurant was on fire. The fire crew searched for the fire for 1 to 1½ minutes with no success. Initially, the fire fighters saw only white, wispy smoke rising from the roof of the building. However, after the roof and the south wall of the building were vented, heavy black smoke developed. Once the fire was located, it was extinguished within 4 to 5 minutes.

Lieutenant Steven Scott investigated the fire for the Yakima Fire Department. Scott concluded that the fire had begun in the food preparation area in the back of the restaurant. Scott further pinpointed the origin as being immediately below the food preparation table. Scott found a hot plate near the point of origin. At trial, Scott testified that he found no evidence of an incendiary device, accelerants, trailers, multiple ignition points, or other evidence usually associated with arson.

As part of his investigation, Scott, who has no experience in the area of electricity or wiring, took both the hot plate and the outlet box to George Picatti, an electrical expert, who examined them. Although he was not allowed to take the outlet box completely apart, Picatti concluded that it did not malfunction. Picatti also concluded that the hot plate was on during the fire.[3] Picatti tested the hot plate and found no malfunction.

During his investigation, Scott discerned that the restaurant may have been facing financial difficulty. Scott found a late notice from Pacific Power and Light in a restaurant garbage can and also discovered that the Department of Labor and Industries had filed a lien against Kallevig on the day of the fire.

Based upon his investigation, Scott's opinion was that David Kallevig intentionally caused the fire which

---

[3]At trial, the parties stipulated that the switch to the hot plate was energized during the fire.

destroyed the restaurant. Scott believed David Kallevig was the last person in the restaurant and had an opportunity to cause the fire. He believed the motive to be financial. He believed that the wall switches were turned off when Kallevig arrived, but that Kallevig turned the wall switch which controlled the outlet box on when he left.

Chief claims representative John Fabian was the person ultimately responsible for the acceptance or denial of the Kallevigs' claim. Fabian learned of the fire on the morning of January 28, 1986. He determined that he needed an independent fire investigator. Accordingly, on January 29, 1986, Industrial Indemnity retained Gerald Anderson of INS Investigations Bureau, Inc. to investigate the fire.[4]

Anderson determined that the fire was not caused by an electrical malfunction; rather it was intentionally set. On February 4, 1986, Anderson informed Fabian that the fire was suspicious. On February 10, 1986, Anderson told him that the fire was intentionally caused. On February 5, Scott also informed Fabian that the fire was suspicious.

On February 4, 1986, Fabian contacted accountant Henry Smilowicz to examine the restaurant's financial records. Smilowicz's examination revealed that at the time of the fire, the Peach Tree's liabilities exceeded its assets.

On February 18, 1986, David Kallevig submitted a proof of loss, which Fabian received on February 21, 1986. On February 19, 1986, Fabian received the Industrial Indemnity underwriter's report of serious loss. In the report, the Industrial Indemnity claims examiner who worked on this case, stated that the cause of fire "may be the result of faulty workmanship of an electrical contractor" and that Industrial Indemnity expected subrogation against the electrical contractor. Despite this information, Industrial Indemnity did not retain an electrical expert to check out the possibility of faulty workmanship of an electrical contractor as a cause for the fire. On February 28, 1986,

---

[4]INS is a company that exists for the sole purpose of serving the investigation needs of insurance carriers.

Industrial Indemnity canceled the policy because of "underwriting–poor risk".

On March 20, 1986, Industrial Indemnity requested that David Kallevig appear for an examination under oath. The Yakima Fire Department had previously requested that David Kallevig, Chuck Smith, and Diana Smiley submit to a polygraph examination. Although Smith and Smiley agreed to submit to the examination, they were never tested. Kallevig, however, refused to submit to a polygraph examination.

On May 2, 1986, Fabian denied the claim. Industrial Indemnity determined that David Kallevig had intentionally caused the fire. Industrial Indemnity then filed a declaratory judgment action to confirm that it was not obligated to pay for the fire loss. The Kallevigs counterclaimed seeking policy benefits and damages for bad faith denial of coverage, based upon violation of the Consumer Protection Act, contending that Industrial Indemnity had failed to adequately investigate the fire and had denied the claim based upon speculation and conjecture.

After Industrial Indemnity filed suit, the Kallevigs carried out their own investigation of the cause and origin of the fire. They conducted tests that demonstrated the hot plate could not start the fire by itself. Moreover, their tests indicated that even if combustibles (paper and cardboard) were placed on the hot plate, the wall would not ignite.

The Kallevigs focused on an electrical malfunction as a potential cause of the fire. They hired John Philbin, a fire protection consultant who served with Seattle Fire Department for 28 years, to examine the fire scene with a particular emphasis toward the electrical aspect. Philbin identified the food preparation room as the origin of the fire. More specifically, he located a point in the center of the wall where the outlet box had been located. He concluded that the origin of the fire was a faulty outlet box which started a "smoldering fire" within the wall space of the food preparation room. Philbin also identified a burn pattern located

under where the food preparation table had been. He attributed this burn pattern to the intensity of the flame from burning plastic dishwashing trays and plastic glasses. In addition, Philbin discovered that the breaker had been tripped, and that Scott's investigation was inadequate because he did not investigate whether the breaker had been tripped.

Philbin also testified that the fire pattern, the concealed nature of the fire, and the observations of the 10 fire fighters who stated that the fire was not visible when they arrived, indicated that the fire was not an intentional fire. Philbin believed that the fire started before 8 p.m. Based upon his investigation, Philbin's opinion was that the fire was not an intentional fire.

Philbin contacted Richard Becker, an electrical engineer, to investigate the electrical aspect of the fire. Based upon his investigation, Becker concluded that an "electrical event took place in the outlet box" before 8 p.m., which caused the breaker switch to trip and may have ignited the wall panel behind the outlet box. Becker testified that the fluorescent light would have been off when the employees left, even though the switch was on, because the breaker had been tripped.

Prior to the trial, the court entered an order in limine preventing Industrial Indemnity from presenting evidence that Kallevig's refusal to take a polygraph examination was a factor in their decision to deny the claim.

On October 26, 1987, a jury trial commenced regarding both the declaratory judgment action and the counterclaim. At trial, Industrial Indemnity moved for a directed verdict against the bad faith and CPA counterclaim on the theory that its decision to deny coverage was not unreasonable. The motion was denied. A unanimous jury found that David Kallevig had not started the fire and also found for the Kallevigs on their CPA claim, concluding that Industrial Indemnity did not act in good faith in denying the claim. The jury awarded the Kallevigs $128,104.69 for breach of insurance contract, and an additional $20,000 for

the CPA violation. Pursuant to RCW 19.86.090, the trial judge increased the damages in the amount of $10,000 and awarded the Kallevigs attorney fees in the amount of $64,422.

Industrial Indemnity's posttrial motions for judgment n.o.v. or, in the alternative, a new trial were denied. Industrial Indemnity then appealed to the Court of Appeals. On June 20, 1989, the Court of Appeals issued its opinion affirming the trial court's rulings in all respects. *Industrial Indem. Co. of the Northwest, Inc. v. Kallevig*, 54 Wn. App. 558, 774 P.2d 1230 (1989). Industrial Indemnity filed a petition for review, seeking review of three of the six issues asserted in the Court of Appeals. On October 3, 1989, we granted the petition. *Industrial Indem. Co. of the Northwest, Inc. v. Kallevig*, 113 Wn.2d 1016 (1989).

We are now asked to decide three issues. First, did the trial court properly deny Industrial Indemnity's motions for directed verdict and judgment n.o.v. on the bad faith claim? Second, may a single violation of the Insurance Commissioner's trade practices regulations constitute a per se unfair trade practice under the Consumer Protection Act? Third, should David Kallevig's refusal to submit to a polygraph examination be admitted as evidence of Industrial Indemnity's good faith in refusing coverage? These issues are addressed seriatim.

## Sufficiency of Evidence

We are first asked to decide whether the trial court erred in denying Industrial Indemnity's motions for directed verdict and judgment n.o.v. Industrial Indemnity contends that there was no evidence from which the jury could reasonably find that it denied insurance coverage in bad faith.

In reviewing a trial court's decision to deny a motion for directed verdict or judgment n.o.v., we apply the same standard as the trial court. A directed verdict or judgment n.o.v. is appropriate if, when viewing the material evidence most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or

reasonable inferences to sustain a verdict for the nonmoving party. *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 67, 738 P.2d 665 (1987).[5] The requirement of substantial evidence necessitates that the evidence be such that it would convince "an unprejudiced, thinking mind". *Hojem v. Kelly,* 93 Wn.2d 143, 145, 606 P.2d 275 (1980).

The inquiry on appeal is limited to whether the evidence presented was sufficient to sustain the jury's verdict. *Cowsert v. Crowley Maritime Corp.,* 101 Wn.2d 402, 412, 680 P.2d 46 (1984); *Bender v. Seattle,* 99 Wn.2d 582, 597, 664 P.2d 492 (1983). Denial of a motion for directed verdict or judgment n.o.v. is inappropriate only when it is clear that the evidence and reasonable inferences are insufficient to support the jury's verdict. *Baldwin v. Sisters of Providence in Wash., Inc.,* 112 Wn.2d 127, 132, 769 P.2d 298 (1989).

Thus, we must determine whether there was sufficient evidence to support the jury's verdict. This poses two inquiries: first, what conduct constitutes bad faith denial of coverage, and second, was there sufficient evidence for the jury to find that Industrial Indemnity denied coverage in bad faith.

RCW 48.01.030 requires insurers to act in good faith in dealing with their insureds.[6] *Pruitt v. Alaska Pac. Assur. Co.,* 28 Wn. App. 802, 804, 626 P.2d 528 (1981). This fiduciary duty to act in good faith is fairly broad and may be breached by conduct short of intentional bad faith or

---

[5]*See also Cowsert v. Crowley Maritime Corp.,* 101 Wn.2d 402, 405, 680 P.2d 46 (1984) (judgment n.o.v. standard); *Bender v. Seattle,* 99 Wn.2d 582, 587, 664 P.2d 492 (1983) (directed verdict standard); *Bertsch v. Brewer,* 97 Wn.2d 83, 90, 640 P.2d 711 (1982) (directed verdict standard); *Hojem v. Kelly,* 93 Wn.2d 143, 145, 606 P.2d 275 (1980) (judgment n.o.v. standard); *Shelby v. Keck,* 85 Wn.2d 911, 913, 541 P.2d 365 (1975) (directed verdict standard); *Moyer v. Clark,* 75 Wn.2d 800, 802–03, 454 P.2d 374 (1969); *Lambert v. Smith,* 54 Wn.2d 348, 351–52, 340 P.2d 774 (1959); 14 L. Orland & K. Tegland, Wash. Prac., *Trial Practice* § 271, at 431 (4th ed. 1986).

[6]RCW 48.01.030 provides, in relevant part, that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters."

fraud. *Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wn.2d 65, 73, 659 P.2d 509 (1983) (quoting *Tyler v. Grange Ins. Ass'n,* 3 Wn. App. 167, 173–74, 473 P.2d 193 (1970)), *modified,* 101 Wn.2d 830, 683 P.2d 186 (1984); *Whistman v. West Am.,* 38 Wn. App. 580, 584–85, 686 P.2d 1086 (1984); *Safeco Ins. Co. of Am. v. JMG Restaurants, Inc.,* 37 Wn. App. 1, 11, 680 P.2d 409 (1984). Thus, an insurer's denial of coverage, without reasonable justification, constitutes bad faith. *See Whistman,* at 585 ("[a]ctions by an insurer done without reasonable justification are done without the good faith mandated by RCW 48.01.030"); *Safeco,* at 15 ("refusal must be based upon reasonable grounds"). *See also Villella v. Public Employees Mut. Ins. Co.,* 106 Wn.2d 806, 821, 725 P.2d 957 (1986); *Royal Globe Ins.,* at 74.

■ An insurer does not have a reasonable basis for denying coverage and, therefore, acts without reasonable justification when it denies coverage based upon suspicion and conjecture. *Safeco,* at 15. *See also Royal Globe Ins.,* at 74 (quoting 16 G. Couch, *Insurance* § 58:168 (2d ed. 1966)). In other words, an insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a supposed defense which a reasonable investigation would have proved to be without merit.

Consequently, the issue before the jury in the present case was whether, in view of the evidence, Industrial Indemnity acted without reasonable justification in denying coverage. To determine if the jury properly found that Industrial Indemnity acted in bad faith, we examine the sufficiency of the evidence.

Industrial Indemnity denied coverage based upon an arson defense which it believed established four points. First, David Kallevig was at the restaurant the night of the fire and, therefore, had an opportunity to set the fire. Second, based upon the financial position of the restaurant, David Kallevig had a financial motive to set the fire. Third, both the Yakima Fire Department investigator, Steven Scott, and Gerald Anderson concluded the fire was caused

by arson. Fourth, electrical engineer George Picatti concluded that the fire was not caused by an electrical malfunction of the hot plate. In other words, Industrial Indemnity theorized that David Kallevig intentionally caused the fire using the hot plate.

The Kallevigs, however, presented contrary evidence on each point. In regard to David Kallevig's opportunity to cause the fire, both Scott and Anderson admitted that there was nothing unusual or suspicious about David Kallevig being in the restaurant the evening of the fire. It was normal routine for him to be there. Further, Scott testified that he estimated the fire started 15 minutes after Kallevig left the restaurant. As to David Kallevig's motive to cause the fire, evidence was presented which showed that the Kallevigs had been in similar financial situations before and had resolved them, and that none of the creditors were applying pressure to make immediate payments.

The Kallevigs also presented evidence that the hot plate/arson theory was speculative. Although it was undisputed that the hot plate could not start the fire by itself, there was no evidence of an incendiary device, accelerants, trailers, multiple ignition points or evidence of arson. Moreover, Industrial Indemnity's own claims examiner stated that the cause of fire "may be the result of faulty workmanship of an electrical contractor" and that Industrial Indemnity expected subrogation against the electrical contractor. Despite this information, Industrial Indemnity never retained an electrical expert to check out the possibility of faulty workmanship of an electrical contractor as a cause for the fire.

Finally, the Kallevigs presented evidence that the fire was not intentionally set but that it was caused by an electrical malfunction in the electrical circuit in the wall of the food processing room. Although Picatti believed that the fire was not caused by electrical malfunction, he never visited the fire scene, had no opportunity to dismantle the outlet box to examine its interior, and conferred with Scott for only 20 minutes in reaching his conclusion.

The trial court found that there was substantial evidence to support the jury's verdict that Industrial Indemnity denied coverage in bad faith. The Court of Appeals, after reviewing the evidence, concluded that the motions for directed verdict and judgment n.o.v. were properly denied. The court stated:

> A jury could find on this evidence that a reasonable insurer would have conducted a more extensive investigation and that [Industrial Indemnity] acted without reasonable justification in denying Mr. Kallevig's claim.

(Footnote omitted.) *Industrial Indem.,* at 563. We agree.

The present case is factually similar to *Safeco Ins. Co. of Am. v. JMG Restaurants, Inc.,* 37 Wn. App. 1, 680 P.2d 409 (1984). There, the insured alleged that its insurer acted in bad faith when it filed a declaratory judgment action seeking a declaration of nonliability under a fire loss policy. The insurer suspected that the fire was intentionally set by the insured who was seen leaving the restaurant shortly before the fire. Evidence indicated that the insured was in financial trouble and that the restaurant was operating at a loss. The fire department arson squad suspected that the insured had intentionally set the fire. The insured was charged with arson. The charge, however, was later dropped. *Safeco,* at 3, 14–15.

In reviewing the trial court's denial of the insurer's motion for a directed verdict, the Court of Appeals stated:

> There is no doubt that there was considerable evidence in [the insurer's] favor. That is not the issue. The question is whether there was evidence, or reasonable inference from evidence, sufficient to warrant submitting the case to the jury and to sustain the jury's verdict under the Consumer Protection Act. The issue is whether there was evidence from which a reasonable person could conclude that [the insurer] was not fair, honest and objective, or that [the insurer] acted without reasonable justification in the handling of [the insured's] claim.

*Safeco,* at 14. The court determined that the "jury could have found that a reasonable and objective person would have recognized that the evidence did not rise above a suspicion and would not have used it as a reason for not

paying the claim of its insured." *Safeco,* at 15. The jury in the present case could also have so found.

■ Finally, Industrial Indemnity argues that, as a matter of policy, its denial of coverage does not constitute bad faith because it relied upon the local fire authority's determination that the fire was caused by arson. Industrial Indemnity, however, cites no authority for such a proposition. It is not the stature of any one investigator that is crucial. What is determinative is the reasonableness of the insurer's action in light of all the facts and circumstances of the case.

In sum, viewing the evidence and the reasonable inferences most favorably to the Kallevigs, we find that there is sufficient evidence to support the jury's verdict. Accordingly, we hold that the trial court did not err in refusing Industrial Indemnity's motions for directed verdict and judgment n.o.v.

## CONSUMER PROTECTION ACT

We are next asked to determine if the trial court properly instructed the jury that a single violation of WAC 284–30–330, which defines 19 types of conduct determined to be "unfair or deceptive acts or practices in the business of insurance, specifically applicable to the settlement of claims", constitutes a per se unfair trade practice under the Consumer Protection Act (CPA).

The CPA provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. RCW 19.86.020. The CPA prohibition against unfair trade practices may be enforced by private citizens. RCW 19.86.090. In *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 719 P.2d 531 (1986), this court enunciated a 5–part test which a private citizen must satisfy in order to prevail in an action brought under RCW 19.86.090. Under this test, a private citizen must show (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and

(5) which injury is causally linked to the unfair or deceptive act. *Hangman Ridge,* at 784–85.

In *Hangman Ridge,* this court further determined that the first element of the 5–part test may be established by showing that the alleged act constitutes a per se unfair trade practice. *Hangman Ridge,* at 786. "A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." *Hangman Ridge,* at 786.

In the present case, Industrial Indemnity argues that jury instructions 3 and 12 were erroneous because they implied that a single violation of WAC 284–30–330 constitutes a per se unfair trade practice. Jury instruction 3 advised the jury of Kallevig's claim that Industrial Indemnity had "acted in bad faith and has thereby violated the Washington Consumer Protection Act in one or more of" twelve enumerated ways. Jury instruction 12 then advised the jury that WAC 284–30–330 prohibits insurers from engaging in certain unfair or deceptive acts. The instruction then specified eight such acts.

The jury's verdict was entered on a special verdict form. Question 3 asked:

> Did plaintiff Industrial Indemnity Company deal with Mr. and Mrs. Kallevig in good faith, fairly, honestly, and objectively, and with reasonable justification in their handling of the defendants' fire loss claim?

The jury answered "no" and awarded $20,000 damages to the Kallevigs. Although the jury's verdict does not necessarily impose CPA liability based upon a single violation of WAC 284–30–330,[7] instructions 3 and 12, taken together, advised the jury that a CPA violation could be based upon a single violation of WAC 284–30–330.

Based upon our analysis of RCW 19.86.170, RCW 48.30-.010, and WAC 284–30–330, we conclude that the trial court correctly instructed the jury. RCW 19.86.170 spells out the

---

[7]The jury could have found that Industrial Indemnity violated two or more unfair or deceptive acts specified in instruction 12.

relationship between the CPA and violations of the insurance code. That statute provides, in relevant part, that

> actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions of RCW 19.86.020 and all sections of chapter 216, Laws of 1961 and chapter 19.86 RCW which provide for the implementation and enforcement of RCW 19.86.020 except that nothing required or permitted to be done pursuant to Title 48 RCW shall be construed to be a violation of RCW 19.86.020 . . .

RCW 19.86.170. Thus, the Legislature expressly provided that violations of the insurance regulations are subject to the CPA.

In the present case, the Kallevigs argue that a first party insured may bring an action for violation of the CPA based upon a violation of RCW 48.30.010(1) resulting from a single violation of WAC 284–30–330. We agree.

RCW 48.30.010 prohibits insurers from engaging in unfair trade practices. The statute, in relevant part, provides:

> (1) No person engaged in the business of insurance shall engage in unfair methods of competition or in unfair or deceptive acts or practices in the conduct of such business as such methods, acts, or practices are defined pursuant to subsection (2) of this section.
> (2) In addition to such unfair methods and unfair or deceptive acts or practices as are expressly defined and prohibited by this code, the commissioner may from time to time by regulation promulgated pursuant to chapter 34.05 RCW, define other methods of competition and other acts and practices in the conduct of such business reasonably found by the commissioner to be unfair or deceptive.

RCW 48.30.010(1), (2).

Pursuant to RCW 48.30.010(2) and RCW 48.02.060, the Insurance Commissioner promulgated regulations governing insurance trade practices. See WAC 284–30–300 et seq. WAC 284–30–330 defines 19 types of conduct which constitute "unfair or deceptive acts or practices in the business of insurance, specifically applicable to the settlement of claims".

A violation of WAC 284–30–330 constitutes a violation of RCW 48.30.010(1), which in turn constitutes a per se unfair trade practice by virtue of the legislative declaration in RCW 19.86.170. This per se unfair trade practice may result in CPA liability if the remaining elements of the 5–part test for a CPA action under RCW 19.86.090 are established.

Industrial Indemnity advances two arguments against finding a per se unfair trade practice based upon a violation of RCW 48.30.010(1) resulting from a single violation of WAC 284–30–330. First, it argues that WAC 284–30–300 precludes CPA liability for a single violation of WAC 284–30–330.[8] Second, it argues that the Legislature did not have the CPA in mind when it enacted RCW 48.30.010 and, therefore, CPA liability should not be based upon a violation of RCW 48.30.010. We find these arguments unpersuasive.

The Court of Appeals has twice considered this issue and determined that a single violation of WAC 284–30–330 does constitute a per se unfair trade practice under the CPA.[9] *Evergreen Int'l, Inc. v. American Cas. Co.*, 52 Wn. App. 548, 761 P.2d 964 (1988); *Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 743 P.2d 832 (1987), *review denied*, 109 Wn.2d 1025 (1988). Although we agree in result, we differ somewhat in our analysis.

---

[8]WAC 284–30–300 provides, in relevant part, that "[t]he purpose of . . . WAC 284–30–300 through 284–30–410, is to define certain minimum standards which, if violated with such frequency as to indicate a general business practice, will be deemed to constitute unfair claims settlement practices."

[9]In two previous cases, we found it unnecessary to decide whether a single violation of WAC 284–30–330 amounts to a violation of RCW 48.30.010. *Villella v. Public Employees Mut. Ins. Co.*, 106 Wn.2d 806, 725 P.2d 957 (1986); *Federated Am. Ins. Co. v. Strong*, 102 Wn.2d 665, 689 P.2d 68 (1984). In both of those cases we stated that "[i]n light of WAC 284–30–300, it is unclear whether a *single* instance of the conduct defined in WAC 284–30–330 amounts to a violation of RCW 48.30.010(1)". *Villella*, at 820 (quoting *Strong*, at 676).

In *Escalante* and *Evergreen,* the Court of Appeals determined that first party insureds may bring an action for violation of the CPA based on a single alleged violation of WAC 284–30–330. *Escalante,* at 390; *Evergreen,* at 558. In other words, *Escalante* and *Evergreen* concluded that a violation of WAC 284–30–330 ipso facto gave rise to CPA liability under RCW 19.86.170.

▉ However, as indicated above, we find that a first party insured may bring an action for violation of the CPA based upon a violation of RCW 48.30.010 resulting from a single violation of WAC 284–30–330. The significance of our departure from the analysis of the Court of Appeals is that any violation that would constitute an unfair trade practice under WAC 284–30–330 is an unfair trade practice under RCW 48.30.010 regardless of whether it would take more than a single violation of WAC 284–30–330 for the Insurance Commissioner to exercise any administrative powers to seek corrective action or penalties against the insurer.

The language of RCW 48.30.010 is plain and unambiguous. RCW 48.30.010 does not contain the frequency requirement set forth in WAC 284–30–300. RCW 48.30.010 prohibits insurers from engaging in any unfair trade practice. In other words, under RCW 48.30.010, a single violation of WAC 284–30–330 constitutes a statutorily proscribed unfair trade practice. Accordingly, an insured may establish a per se unfair trade practice under the CPA by demonstrating a violation of RCW 48.30.010 based upon a single violation of WAC 284–30–330.

Industrial Indemnity also argues that because RCW 48.30.010 was enacted prior to the CPA,[10] a violation of RCW 48.30.010 does not afford CPA liability. This argument is also unconvincing.

▉ In RCW 19.86.170, the Legislature expressly provided that violations of the insurance code are subject to the CPA. Moreover, RCW 48.30.010 has been amended

---

[10]RCW 48.30.010 was enacted in 1947. Laws of 1947, ch. 79, § .30.01, p. 476. The CPA was enacted in 1961. Laws of 1961, ch. 216, § 1, p. 1956.

three times since the CPA was enacted and yet the Legislature has not afforded the insurance industry immunity from CPA liability. *See* Laws of 1985, ch. 264, § 13, p. 915; Laws of 1973, 1st Ex. Sess., ch. 152, § 6, p. 1111; and Laws of 1965, 1st Ex. Sess., ch. 70, § 24, p. 1876. We presume that the Legislature is aware of its own enactments. Accordingly, we will not eviscerate the plain language of RCW 19.86.170 which makes RCW 48.30.010 subject to the CPA.

In sum, the trial court correctly instructed the jury. A single violation of WAC 284–30–330 constitutes a violation of RCW 48.30.010. Under RCW 19.86.170, a violation of RCW 48.30.010 is a per se unfair trade practice and satisfies the first element of the 5–part test for bringing a CPA action under RCW 19.86.090.

## POLYGRAPH

Industrial Indemnity next contends that the trial court erred in excluding evidence of David Kallevig's refusal to submit to a polygraph examination. Industrial Indemnity argues that all information which was considered by it in denying the claim is relevant in determining if it acted reasonably.

Thus, we are asked to decide if evidence of an insured's refusal to submit to a polygraph examination, when offered to demonstrate a good faith basis for denying an insurance claim, is admissible. This is an issue of first impression.

The Court of Appeals concluded that the evidence was inadmissible under ER 403:[11]

> While the polygraph information may have been probative of [Industrial Indemnity's] state of mind in denying the Kallevigs' claim, the risk of the jury considering it as evidence that Mr. Kallevig committed arson was so great that the trial court properly excluded it.

*Industrial Indem. Co.,* 54 Wn. App. at 569.

---

[11]ER 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice".

■ We agree. A trial court has broad discretion in performing the balancing test contemplated in ER 403 and will be reversed only upon a showing of abuse of discretion. *Kirk v. WSU,* 109 Wn.2d 448, 462, 746 P.2d 285 (1987); *State v. Hughes,* 106 Wn.2d 176, 201–02, 721 P.2d 902 (1986); *State v. Mak,* 105 Wn.2d 692, 702–03, 718 P.2d 407, *cert. denied,* 479 U.S. 995 (1986). A trial court abuses its discretion when its discretionary decision is "manifestly unreasonable or based upon untenable grounds or reasons." *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 77, 684 P.2d 692 (1984) (citing *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

■ In the present case, the trial court did not abuse its discretion in excluding the evidence of David Kallevig's refusal to submit to a polygraph examination. Because the jury was to decide both the declaratory judgment claim, in which Industrial Indemnity's defense was that David Kallevig committed arson, and the bad faith counterclaim, the trial court properly concluded that the evidence was unduly prejudicial. *See deVries v. St. Paul Fire & Marine Ins. Co.,* 716 F.2d 939, 945 (1st Cir. 1983);[12] *Aetna Ins. Co. v. Barnett Bros., Inc.,* 289 F.2d 30, 34 (8th Cir. 1961).

Industrial Indemnity, however, argues that we should follow the rule articulated in *Moskos v. National Ben Franklin Ins. Co.,* 60 Ill. App. 3d 130, 376 N.E.2d 388 (1978) that polygraph evidence is admissible if limited to

---

[12]In *deVries,* the First Circuit was presented with a similar situation as the case before us. There, the insured filed suit for the proceeds of their fire policy and for further damages allegedly suffered as a result of the insurer's bad faith. Investigations by the insurer and local law enforcement authorities determined that the fire in question was caused by arson. During the course of the investigation, the insured refused to submit to a polygraph examination. The insurer argued that evidence of the insured's refusal to submit to a polygraph examination should be admissible on the issue of whether they denied the claim in bad faith. The court, however, concluded that

the possibility that the jury would treat the [insureds'] refusal as evidence of their responsibility for the fire, the other issue at the trial, gave rise to a serious danger of prejudice to the [insureds]. The district court therefore acted well within its discretion in excluding the evidence.

*DeVries,* at 945.

proof of an insurer's good faith in denying a claim. However, *Moskos* is easily distinguishable from the present case. In *Moskos,* the trial court bifurcated the bad faith claim from the policy claim. Although the jury found in favor of the insured on the policy claim, the court granted summary judgment in favor of the insurer on the bad faith claim. Because of the bifurcation, however, there was no danger that the polygraph evidence would prejudicially affect the insured on the policy claim. The polygraph evidence was used by the trial judge to decide only the bad faith claim.[13]

It is also noteworthy that Illinois has licensing procedures for polygraph examiners. Ill. Ann. Stat. ch. 111, ¶¶ 2401–2432 (Smith–Hurd Supp. 1989). Washington, however, does not regulate or certify polygraphs, license polygraph operators, or provide standards or requirements for training polygraph operators. *State v. Grisby,* 97 Wn.2d 493, 502, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211 (1983). In this regulatory void, litigants may be required to condition important rights upon their decision to submit to an examination in which there are no standards for the machine or its operator. That is a result we refuse to sanction.

Finally, a subsequent Illinois appellate court has declined to follow *Moskos. See Lynch v. Mid–America Fire & Marine Ins. Co.,* 94 Ill. App. 3d 21, 418 N.E.2d 421 (1981). In *Lynch* the trial court refused an offer of proof that a polygraph examination was given to the insured and the examiner's opinion was that the insured showed deception

---

[13]There are further distinguishing elements. In *Moskos,* the insured did submit to a polygraph examination, but he intentionally engaged in erratic breathing and acted against the instructions of the examiner so that an accurate reading could not be obtained. The examiner's opinion was that such acts were generally conducted when a subject wished to prevent the tester from discovering that the subject was not telling the truth. Thus, the insured's conduct during the examination was at issue, not his refusal to submit to a polygraph examination. Furthermore, *Moskos* involved the admissibility of the results of a polygraph examination. We are concerned here with the admissibility of a refusal to submit to a polygraph examination.

when he denied setting a fire. The appellate court affirmed the trial court's decision stating:

> As the evidence would have been likely to have been improperly considered by the jury as to the arson policy defense despite any limiting instruction, the trial court did not err in balancing the prejudice against the probative value and denying admission.

*Lynch*, at 30. Similarly, we decline to follow the *Moskos* rule.[14]

In sum, we find that the trial court did not abuse its discretion in excluding evidence of David Kallevig's refusal to submit to a polygraph examination requested by the Yakima Fire Investigator.

Amicus on behalf of Washington State Trial Lawyers Association asks that we take an even broader stance and hold that the refusal to submit to a polygraph examination is per se inadmissible. Although its reasoning is persuasive, we decline to do so at this time. Such a ruling is unnecessary to the resolution of this case and, as such, would be dicta. More importantly, we have not had the benefit of the inclusive legal briefing from all parties necessary to undertake such a multifaceted analysis.

The judgment of the Court of Appeals is affirmed as modified. Pursuant to RAP 18.1, respondents are awarded their attorney fees and expenses on appeal.

CALLOW, C.J., UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, and SMITH, JJ., and MADDOCK, J. Pro Tem., concur.

---

[14]In *Britton v. Farmers Ins. Group*, 221 Mont. 67, 721 P.2d 303, 315 (1986), the Montana Supreme Court also declined to follow the *Moskos* rule.