
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DIANA M. ROBINSON, a married person, | ) ) ) | No. 38219-2-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| CITY OF OMAK, a municipality; STATE OF WASHINGTON DEPARTMENT OF TRANSPORTATION, a public entity; and GRANITE CONSTRUCTION, a California corporation, | ) ) ) ) ) ) | |
| Respondent. | ) | |

EKSTROM, J.[*] — Diana Robinson tripped and fell on a Department of

Transportation (DOT) constructed sidewalk curb in Omak which injured her elbow

resulting in permanent nerve damage.  A jury found DOT partially liable for negligent

design and construction of the curb and awarded full economic damages but zero non-

economic damages.  Ms. Robinson moved for a new trial on the issue of non-economic

damage award, which the trial court denied.  The DOT moved for directed verdict on the

issue of liability, which the trial court also denied.  Ms. Robinson challenges the denial of

---

[*] Judge Alexander Ekstrom is serving as judge pro tempore of the Court of
Appeals pursuant to RCW 2.06.150.

her motion where the zero damage award for pain and suffering is not supported by the record.

## FACTS

During the summer of 2014, the city of Omak contracted with the DOT to design and construct improvements to the SR 215 highway corridor.[1] The project included modifying sidewalks to bring them into compliance with the Americans with Disabilities Act (ADA). The DOT designed the plans and then subcontracted the construction to Granite Construction Company. The project was completed in the fall of 2014.

The DOT project included modification of the southeast corner of Bartlett and SR 215 in Omak. Before the project, the curbs next to the building were "flush." After construction, the curb next to the building extended out from the corner of the building into the sidewalk.



---

[1] Nothing in the contract relieved the State from tort liability and the indemnification clauses clearly say that the State remains liable for its torts. Ex. 43 at 5-6.

The original concrete was removed then built back to its original grade resulting in a curb raised 4 inches above the newly lowered sidewalk pavers.  The increase in the height of the curb was not necessary to support the adjacent building.  The curb extends 20 inches perpendicularly from the building.  The curb is 3 feet from the start of the ADA street ramp.  Sidewalks are required to be at least 5 feet wide.  Report of Proceedings (RP) at 390.  From the perspective of someone walking north toward the corner, one cannot tell that the curb next to the building is not level with the sidewalk.  ASTM[2] International and ADA standards both contain pedestrian safety standards that impose a quarter inch limitation on vertical obstructions, including drops, in a walkway.  The ADA does not require the curb next to the building to be raised.  At trial, Joellen Gill, engineer and human factors expert, testified that the finished walkway violated safety standards and presented a hazard to the public because of the sudden drop.

On August 13, 2014, Kevin Fletcher complained to the DOT construction inspector that the curb adjacent to his building at the "southeast corner of the Bartlett/SR 215 intersection" was a trip hazard.  RP at 211.  Mr. Fletcher has seen numerous people trip on the curb.  The inspector told his supervisor, DOT engineer Kevin Waligorski, to look at the retaining curb at that location.  No one considered changing the curb level.

---

[2] Formerly known as American Society for Testing and Materials.

3

Yellow warning paint was discussed but not added by the DOT. The city of Omak added it some time after this incident.

On August 16, 2015, Diana Robinson (age 62 at the time) was walking northbound and tripped over a sidewalk backing curb located against the building at the southeast corner of Bartlett Avenue and Main Street (SR 215) in Omak, Washington. Her husband, Dennis Robinson, was unable to catch her and as she fell forward, she "was airborne for a little bit" and came down "laying straight out" with her arms ahead of her. RP at 45, 108. She immediately stated "I can't move. I'm—something broken." RP at 46. She was unable to get up. She said "My hand is dead" because there was no feeling in it. RP at 108-09. She meant her left arm and hand.[3] She went into shock and does not remember pain. Mr. Robinson testified that he was frightened and "traumatized" by what happened to his wife. RP at 51. He called 911 and removed her rings and watch so they would not have to be cut off due to swelling. Ambulance personnel put a tourniquet on her arm and took her to the hospital. Ms. Robinson did not complain of knee pain at this time and it was not x-rayed.

At the hospital, according to medical records, Dr. Jason Lamberton confirmed a fracture-dislocation of her left elbow: particularly a radial head fracture, coronoid process

---

[3] Ms. Robinson is right hand dominant.

fracture, posterior elbow dislocation and olecranon fracture.[4]  At that time, he noted her report of tingling in her left fingers which was indicative of ulnar nerve injury.  He kept her overnight and "put her under" for surgery to reset her arm the next morning, August 17.  He installed multiple small metal plates and screws to hold fragments of her arm and elbow bone together.  Dr. Thomas Gritzka testified this is a difficult injury to repair. When Ms. Robinson woke up from surgery, her arm was in pain and was covered with a large "V" shaped cast.  The cast was not comfortable and had to be rewrapped to reduce pain.  She spent a second night in the hospital.  Her husband drove her home because she could not drive with a cast.  She "didn't like the bumps" in the road.  RP at 112.  At home, she took medication for pain.  She had to sleep in the recliner for eight months because the cast would not allow her to lie down in bed.  Her condition was "really a hard thing" and the couple's relationship suffered because they "didn't get to do anything with each other" conjugally.  RP at 53-54.  It was difficult for Mr. Robinson to see his wife suffering in pain.

Ms. Robinson went to see Dr. Alan Thomas in August 2015 for a follow-up visit. Her arm, elbow and hand were giving her "a lot of pain" including paresthesias, a burning or prickling sensation, in the ulnar aspect of her left hand.  Clerk's Papers (CP) at

---

[4] At trial, Dr. Alan Thomas and Dr. Thomas Gritzka disagreed whether the fall injured Ms. Robinson's right knee or whether her meniscus tear was due to age.  She first noticed knee complaints 9 months after the fall.

152. The ulnar nerve controls the small finger, ring finger, and parts of the side of the palm and the back of the hand allowing a person to open and close the fingers. Ulnar nerve problems result in the inability to extend finger joints, known as "ulnar claw hand," and the loss of fine motor control. RP at 251-52. Dr. Thomas determined that the metal hardware in her arm was starting to come apart and needed repositioning which resulted in a second surgery in September. He removed the original hardware, installed new hardware in a new configuration to stabilize fragments that had not healed, and "released" her ulnar nerve. RP at 248-49. After this second surgery, she "was still in a lot of pain" due to inflammation requiring narcotics. RP at 114. Her experience of left hand numbness, altered sensation and weakness persisted. Dr. Thomas noted significant loss of motion in her elbow. He ordered an EMG[5] nerve test which confirmed "she clearly had altered function" and ruled out carpal tunnel syndrome. RP at 249-51, 306. Starting in December 2015, Ms. Robinson was required to wear finger splints to prevent permanent finger displacement from nerve damage and muscle atrophy.

In March 2016, Ms. Robinson had a third surgery to remove the metal hardware and scar tissue, move her ulnar nerve and surgically loosen her elbow tendons. Being cut did not relieve her pain and did not resolve the weakness in her hand.

---

[5] Electromyography nerve conduction study.

Ms. Robinson then started physical therapy and completed two sessions consisting of appointments 2-3 times per week for 12 weeks. The therapist tried to strengthen her hand and elbow. Physical therapy appointments lasted a couple hours and were painful "at first." RP at 116. Her exercises did not fix the problem and she eventually stopped treatment. She holds her left arm in her lap because the "numbing and tingling" is constant. RP at 124. It "wouldn't be good" if someone grabbed her arm or hand. RP at 124. Examination in 2018 confirmed the continuation of her symptoms. All of the fingers of her left hand were deviated into an ulnar deformity and she exhibited residual swelling, weakness, loss of sensory acuity and hypersensitivity from her injury.

At trial, both medical doctors agreed in every respect regarding Ms. Robinson's left elbow, hand and nerve injury and directly attributed them to the fall. Dr. Gritzka concluded that she has a "catastrophic" injury. Both doctors agreed that she has a permanent disability of 25 percent for which there is no medical solution. Despite cross-examination on the stand, the doctors never wavered in their opinions regarding Ms. Robinson's elbow and nerve injury and its relation to her pain and loss of motor control. Both ruled out Ms. Robinson's 2013 thumb surgery and 2019 carpometacarpal (CMC) thumb issues: they attributed her pain to the ulnar nerve injury from the fall based on the results of an EMG study. Ms. Robinson's pain complaints and impairment derive from "loss of function of the ulnar nerve" as a consequence of its damage. RP at 337. None of Ms. Robinson's physicians suggested she exaggerated her pain or limited motion.

The case went to trial nearly six years after the accident. Mr. Robinson testified that his wife's condition had not improved as of the time of trial and that he still had to lift things for her due to her hand impairment. Ms. Robinson testified that she still wakes up at night 2 to 3 times per week and sleeps in the recliner because "the baby finger and the ring finger" on her left hand are "cold," "numb and tingly." RP at 117-18. She experiences the same symptoms during the day and experienced them while testifying. Her left hand remained deformed at the time of trial even though she could hold the microphone on the stand to steady it and could hold other things. She cannot lift heavy items. She could not flatten her left hand fingers on the table or control those fingers normally. She testified "It has never stopped." RP at 119. She continued to visit and vacation with her family. Pain did not stop her from trying to hug her grandchildren but she was afraid to lift them due to hand weakness. She could not use her left hand to cook because "it's really hard to grip" but could use her right hand. RP at 120. Her husband and daughters had to help her lift heavy two-handed things. She had difficulty doing two handed things like blow drying her hair straight with a brush. She lacked fine motor control to pick up tiny objects with her left hand and instead used her right hand.

At the conclusion of testimony of Dennis Robinson, Ms. Robinson's husband, a juror sent the trial court a question that asked whether insurance covered a portion of Ms. Robinson's medical bills. In conformance with an order in limine prohibiting evidence of

insurance, the trial judge declined to pose the question for Mr. Robinson. Ms. Robinson's total documented medical expenses totaled $92,868.21.

At the conclusion of Ms. Robinson's case in chief, the DOT moved for CR 50(a) directed verdict arguing that (1) the DOT did not owe any owner maintenance duty of care under RCW 47.24.020(2), and (2) that Ms. Robinson had not proved that the design or construction of the sidewalk was not reasonably safe. The trial court denied the motion as to the ownership argument because the state tort claims act removed immunity for construction torts. The designated record on review does not indicate the trial court's ruling for the design and construction evidence issue, which was heard a different day. Since the jury reached a verdict and DOT is appealing, we presume the trial court denied the motion.

The court instructed the jury, "The State has a duty to exercise ordinary care in the design and construction of public sidewalks to keep them in a reasonably safe condition for ordinary travel." CP at 33. The jury was also instructed to consider both past and future economic and noneconomic damages. The jury found that the DOT's negligent design and construction of the sidewalk caused 38 percent of Ms. Robinson's injury, and that Ms. Robinson was 62 percent contributorily negligent. The special verdict awarded Ms. Robinson $92,868.21 in economic damages and "zero" for past and future noneconomic damages. The jury found the city of Omak not liable.

9

Ms. Robinson moved, under CR 59(a)(7), for a new trial, limited to the issue of noneconomic damages. She argued that the zero amount was inconsistent with the uncontradicted evidence of injury and pain and suffering. The DOT asserted that general damages are not required and argued that the failure to do "substantial justice" prong of CR59(a)(9) had not been met. CP at 121-29. The DOT also asserted that, because it had contested the medical evidence, the zero damages were consistent with the jury weighing the evidence. The trial court denied Ms. Robinson's motion for a new trial without written findings. The trial court acknowledged during the hearing that Ms. Robinson's presentation of special and general damages was "clear" but felt that cross-examination questions propounded to the doctors constituted a contradiction of the proximate cause of Ms. Robinson's injury. The court also reasoned that jury observations that Ms. Robinson was "okay" at trial nearly six years after the injury and the failure to request future special damages was enough for the jury to deny general damages for the time immediately after the injury. Finally, the court felt there was a fair trial since the jury was unanimous.

Ms. Robinson timely appealed. The DOT then cross-appealed, arguing that there was insufficient evidence of the DOT's breach of a construction and design duty, and thus it was error for the trial court to deny its motion for a directed verdict.

ARGUMENT

Because the DOT has cross-appealed the issue of liability, we address it prior to

Ms. Robinson's challenge to the jury's zero award for past and future non-economic

damages.

## I.  THE RECORD BEFORE THE COURT IS INADEQUATE FOR REVIEW OF THE DOT CROSS-APPEAL ON LIABILITY

The DOT assigns error to the trial court's failure to grant its CR 50 motion for a

directed verdict on construction and design liability.  A trial court's entry of a directed

verdict is reviewed de novo.  *Wells v. Nespelem Valley Electric Cooperative, Inc.*, 13 Wn.

App. 2d 148, 153, 462 P.3d 855 (2020).  Where the trial court denies a motion for

directed verdict under CR 50(b), "we apply the same standard as the trial court."

*Industrial Indem. Co. of the Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 915, 792 P.2d

520 (1990).  A directed verdict is proper only when the court can find, as a matter of law,

"'that there is neither evidence nor reasonable inference therefrom sufficient to sustain

the verdict.'"  *Alum. Co. of Am. v. Aetna Cas. & Sur. Co*., 140 Wn.2d 517, 529, 998 P.2d

856 (2000) (internal quotation marks omitted) (quoting *Goodman v. Goodman*, 128

Wn.2d 366, 371, 907 P.2d 290 (1995)).

While the DOT assigns error to the trial's denial of its motion regarding any

construction and design duty to Ms. Robinson, it has failed to adequately designate the

record so that its argument can be reviewed.[6]  The DOT has failed to designate a written

order or the report of proceedings for the CR 50 motion on construction and design

liability.  The report of proceedings, from March 19, 2021, addresses a separate CR 50

motion for directed verdict related to ownership, an argument the DOT now concedes.

The DOT has also failed to designate for review its own design witnesses, leaving the

testimony of Ms. Robinson's witnesses, including Ms. Gill, and other lay evidence

uncontradicted.  RAP 10.3(a)(6) (briefs should contain references to relevant parts of the

record).  Because the DOT has failed to meet its burden to properly designate the order

and the record of proceedings for the issue it raises, the record is insufficient for

meaningful consideration.  We are precluded from reviewing it on appeal.  *Rhinevault v.*

*Rhinevault*, 91 Wn. App. 688, 692, 959 P.2d 687 (1998) (Court's may decline to reach

the merits of an issue where record not properly perfected.).

II.  THE JURY'S DENIAL OF NONECONOMIC DAMAGES IS UNSUPPORTED BY
THE RECORD AND MS. ROBINSON IS ENTITLED TO A NEW TRIAL ON THIS
ISSUE

While CR 59(a) sets forth multiple grounds for granting a new trial, Ms. Robinson

relies only on one: CR 59(a)(7).  A trial court may grant a new trial when there is no

---

[6] We recognize that the DOT sought and was granted permission to supplement the record, that the supplemental designation subsequently submitted was rejected, and that our commissioner allowed the DOT to refile their supplemental designation by April 14, 2022.  Comm'r's Ruling (Wash. Ct. App. April 7, 2022).  A review of this additional material, filed on May 17, 2022, does not improve the position of the DOT on this issue. We therefore decline to address the late filing.

evidence or reasonable inference from the evidence to justify the jury's verdict. CR 59(a)(7).

A ruling on a CR 59 motion for new trial based on allegations of inadequate damages will be reversed only when the trial court has abused its discretion. *Palmer v. Jensen*, 132 Wn.2d 193, 197, 937 P.2d 597 (1997) (citing *Wooldridge v. Woolett*, 96 Wn.2d 659, 668, 638 P.2d 566 (1981)). "A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993). "[I]t is an abuse of discretion to deny a motion for a new trial where the verdict is contrary to the evidence." *Palmer*, 132 Wn.2d at 198 (quoting *Krivanek v. Fibreboard Corp.*, 72 Wn. App. 632, 637, 865 P.2d 527 (1993)) (trial court abused its discretion when it denied a new trial on the basis of inadequate damages in wrongful death case because damages were not within the range of uncontroverted evidence). Conversely, "[a] trial court has no discretion to disturb a verdict within the range of evidence." *Herriman v. May*, 142 Wn. App. 226, 232, 174 P.3d 156 (2007) (citing *Bunch v. King County Dep't of Youth Servs*, 155 Wn.2d 165, 177-78, 116 P.3d 381 (2005). To make this determination, reviewing courts will independently look to the record to evaluate whether there is sufficient evidence to support the verdict. *Palmer*, 132 Wn.2d at 197. Evidence is viewed in the light most favorable to the nonmoving party. *Herriman*, 142 Wn. App. at 232. The reviewing court is also entitled to accept as verities those items of damage

13

which are conceded, undisputed and "beyond legitimate controversy." *Ide v. Stoltenow*, 47 Wn.2d 847, 851, 289 P.2d 1007 (1955) (affirming grant of new trial for inadequate damages where special and general damages for scalp injury pain were both supported by the record). "Where special damages are undisputed, and the injury and its cause is clear, the court has little hesitancy in granting a new trial when the jury does not award these amounts." *Krivanek*, 72 Wn. App. at 636.

In *Palmer*, after determining that the jury had failed to award general noneconomic damages for pain and suffering as part of its overall damages, the court reviewed the record to determine if the omission was contrary to the evidence. *Palmer* 132 Wn.2d at 201-02. After an auto collision, Ms. Palmer experienced neck pain, low back pain, headaches and sleep difficulties all resulting from the collision. *Id*. at 202. Ms. Palmer underwent ten months of physical therapy, took prescribed pain medications and identified recurring back pain at follow-up medical appointments over a year after the collision. *Id*. The Supreme Court reversed the trial court for abuse of discretion where the jury's verdict was contrary to the uncontroverted evidence of Ms. Palmer's experience of pain and suffering for over two years from the date of the collision. *Id*. at 203. The verdict as to Ms. Palmer's son was affirmed because the record indicated his injury and pain was "minimal" and transient, as reflected by medical care totaling $34 for a single office visit and the fact that no further medical care was prescribed following the day of the accident. *Id*. at 202.

The case of *Fahnrich v. Williams* addressed the identical issue now before this court. 147 Wn. App. 302, 194 P.3d 1005 (2008). Where liability and the entry of zero economic damages were clearly delineated on the verdict form, it was unnecessary to assess the level of controversy around the special damages as they arose from the injury and causation. *Id.* at 307 n.2. Review was limited to whether the evidence supported the jury's failure to award noneconomic damages. *Id*. at 306-07. Where significant special damages were awarded, the reviewing court also concluded that the injuries involved were not minimal, rendering the causation of the auto collision irrelevant to the issue of the existence of the plaintiff's pain. *Id*. at 307-08. In *Fahndrich*, the plaintiff underwent continuous treatment for debilitating headaches and neck pain for six years between the auto collision and trial. *Id*. at 304-05, 308. She presented "extensive evidence of her pain and suffering" from both lay and expert witnesses at trial. *Id*. at 308.

While medical experts disagreed about the exact diagnosis, the defendants did not contradict evidence of the plaintiff's symptoms. *Id*. The trial court's denial of the plaintiff's motion was reversed and the case remanded for a new trial because the jury believed without basis that the plaintiff suffered no pain from the collision caused injuries. *Id*. at 309 (citing *Ma'ele v. Arrington*, 111 Wn. App. 557, 562, 45 P.3d 557 (2002)).

Here, like *Fahndrich*, the DOT did not contradict the plaintiff's testimony that she sustained substantial injury, that she received related medical treatment, and that both

during her injury, treatment, and recovery, she experienced pain, discomfort, and life impacts. Ms. Robinson's ability to perform some tasks does not contradict the evidence of her disability, just as juror observations nearly six years after her injury do not contradict the fact of her injury and the pain she experienced during the two years of her initial recovery. Because the evidence does not support the conclusion that Ms. Robinson suffered no pain or disability as the result of her injury, the trial court abused its discretion in denying her a new trial. Because the trial court did not make specific findings as to past and future noneconomic damages, both should be considered anew by the jury on remand.

We deny the cross-appeal as insufficiently preserved. We reverse and remand for a new trial on past and future noneconomic damages.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Ekstrom, J.P.T.

Ekstrom, J.

WE CONCUR:

Fearing, J.

Lawrence-Berrey,