# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| A.K.,<br><br>　　　　Respondent / Cross-Appellant,<br><br>　　　　　　　　v.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES; MONROE SCHOOL<br>DISTRICT; and JANE and JOHN DOES 1-100,<br><br>　　　　Appellants / Cross-Respondents. | No. 86100-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — The Department of Children, Youth, and Families (DCYF) appeals from a judgment on a jury verdict awarding A.K. damages totaling $3 million on her claim that DCYF's employee and Child Protective Services (CPS) social worker Jocelyn Wicks failed to report that former Monroe Police Department Sergeant Carlos Martinez sexually abused A.K. when she was 13-14 years old. After the close of evidence, DCYF filed a motion under CR 50 for judgment as a matter of law arguing A.K. had failed to prove causation. The trial court denied the motion, and DCYF argues on appeal the court erred in so ruling. We disagree, as A.K. presented in her case in chief substantial evidence establishing causation. The trial court, therefore, did not err in denying DCYF's motion and allowing the jury to decide this issue.

DCYF also appeals, and A.K. cross-appeals, the trial court's posttrial ruling awarding monetary sanctions against DCYF and the Attorney General's Office (AGO) totaling $65,762 based on their failure to timely disclose and produce a recorded statement in which Wicks stated she "was a hundred percent sure that . . . something . . . had gone on physically between them [(referring to Carlos[1] and A.K.)]." A.K. argues the sanctions award should be vacated and the issue remanded for further consideration because the trial court applied the incorrect legal standard in assessing sanctions. DCYF, in contrast, argues the trial court erred in concluding it violated the applicable discovery rule. We agree with A.K. and disagree with DCYF. But while we agree the trial court applied the wrong legal standard in assessing sanctions, we nevertheless affirm the trial court's award because the error was harmless.

I

A.     The underlying sexual abuse and alleged failure to report

A.K. first met former Monroe Police Department Sergeant Carlos Martinez when he was a Drug Abuse Resistance Education (DARE) instructor at her elementary school. Later, in 2003, when A.K. was around 13 or 14 years old, she began babysitting Carlos's children. Carlos began taking pictures and recording videos of A.K. in the bathroom of his house without her knowledge. A.K. grew attached to Carlos, who then began to rape A.K. Carlos recorded thousands of videos depicting the violent sexual abuse A.K. suffered for nearly a decade.

---

[1] Because we refer herein to both Carlos Martinez and Julie Martinez, we refer to them by their first names for clarity.

During the early stages of the abuse in 2003 and 2004, when A.K. was 13 or 14 years old, she also babysat the child of CPS social worker Jocelyn Wicks. Wicks hired A.K. on the recommendation of Carlos and his wife, Julie. Wicks, who was likely involved in an extramarital affair with Carlos during this time, described Carlos as aggressive and manipulative. Wicks began to realize Carlos was having an inappropriate relationship with A.K. when she noticed A.K. was "very focused" on him, "hung on his every word," and was "googly-eyed" toward him.

Wicks's suspicions that Carlos was raping A.K. were confirmed one evening when she was driving A.K. home after A.K. babysat for her. As Wicks drove past the Martinez residence, A.K. became "visibly tearful." When Wicks asked A.K., "[w]hat's going on," A.K. told Wicks about a romantic letter A.K. had written to Carlos that Julie had found and was upset about. Wicks responded, "Did Carlos do that to you? I knew it. I knew it." A.K. did not answer and remained "very tearful." That night, Wicks gave A.K. her CPS business card "if she wanted to talk." Wicks subsequently confronted Carlos about his relationship with A.K. because she "wanted him to think he couldn't just fool everybody" and told him "[p]rotection is what I do for a living." Wicks asked Carlos questions about his relationship with A.K., which Carlos refused to answer.

Wicks also discussed Carlos with A.K.'s school counselor, Lena Berg. A.K. had met with Berg after Julie Martinez called A.K. to confront her about the letter A.K. sent to Carlos. Julie had forbidden A.K. from babysitting her kids and told her to "[s]tay away from my husband." A.K. met with Berg because she did not feel comfortable telling her parents about the sexual abuse she was experiencing. As

soon as A.K. was in Berg's office, "she burst into tears and told [Berg] that the wife of the man for whose children she's been babysitting for a long time had called her and accused her of having an affair with her husband." A.K. testified that Berg said, "[i]f you cry wolf so many times, no one will hear you."

When A.K. left Berg's office, she passed Wicks in the hall, and Wicks greeted her before entering Berg's office to discuss an unrelated CPS matter. Having just seen A.K., Berg and Wicks began discussing her relationship with Carlos. Berg expressed her distrust of Carlos, stating that she "didn't think he was on the up and up." Berg also said that "[Carlos] shouldn't be teaching DARE students," and "I don't think he's doing what he should be doing." The next day, Wicks called Berg and disclosed that she had a personal relationship with Carlos. Wicks also said she wanted to talk with A.K. and expressed concern about "what [Carlos] might do as a police officer in the community." Despite feeling bad for A.K., giving A.K. her CPS business card, and expressing concern about A.K.'s relationship with Carlos, Wicks did not report that Carlos was sexually abusing A.K. because she "didn't want to get involved" or "muddy any waters."

Following these events, A.K. and her family moved from Monroe to Eastern Washington in the summer of 2004 and Wicks never saw A.K. again. But the abuse continued. During this time, Carlos traveled to Eastern Washington and brought A.K. to Monroe so he could rape her. After she graduated high school, A.K. moved back to Western Washington and then to Texas where she lived with Carlos. In Texas, Carlos became more abusive and began threatening A.K. that he would tell her family what a "bad person" she was and she would be living on

the streets. He also threatened to post sexually explicit pictures of A.K. on the internet. He showed A.K. the secret videotapes he had recorded of her as a child, which terrified her. After that, A.K. reported this information to police in Texas, who then referred the matter to the Washington State Patrol (WSP) in 2012.

WSP Lieutenant William Steen was the lead investigator assigned to the case. WSP discovered that Carlos had taken around 650,000 images and approximately 2,500 videos of A.K. capturing the years-long sexual abuse she suffered. The investigators spoke with A.K. several times. Steen also interviewed Berg and retrieved her handwritten notes about A.K. and Carlos. Investigators interviewed Julie, who gave them the letter A.K. wrote to Carlos in 2004. Additionally, as part of its investigation, WSP recorded a statement by Wicks in which she admitted she "was a hundred percent sure that, you know, something . . . had gone on physically between them." Carlos was eventually charged with rape of a child and convicted.

B.  A.K.'s negligence claims and the parties' discovery dispute

In 2019, A.K. sued DCYF alleging it had, and breached, "an ongoing duty to report, monitor and investigate the relationship between A.K. and Carlos Martinez."[2] At trial, A.K. presented the evidence detailed above along with testimony from Jane Ramon, who described the standard of care for CPS workers, and testimony from Steen about WSP's investigative procedures. After the close of evidence, DCYF filed a CR 50 motion based on "Plaintiff's failure to produce any

---

[2] A.K. also asserted a negligence claim against the Monroe School District alleging it had, and breached, "a heightened duty to protect and care for A.K. after being informed of abuse and/or the potential for abuse by Carlos Martinez." The jury resolved this claim in the District's favor, and that finding is not at issue in this appeal.

admissible evidence of proximate cause." The trial court denied the motion, stating "the jury can infer and make its decision based on the testimony of Ramon, the testimony of the State's witness and her responses to what happened, and Ramon and Detective Steen's testimony." The case was then submitted to the jury, which returned a special verdict finding that DCYF was negligent and its negligence was a proximate cause of A.K.'s injury. The jury awarded A.K. $3 million in damages. DCYF appealed the judgment, and A.K. cross-appealed.

Shortly after the parties appealed and cross-appealed the judgment, A.K. filed in the trial court a motion to vacate the judgment and for sanctions against DCYF and the AGO for discovery violations and for "fraud on the court." A.K. claimed DCYF had failed to turn over Wicks's recorded statement made to WSP investigators in 2013. This issue first arose much earlier in the case, and the trial court had held a hearing on this issue on October 20, 2023, shortly after the start of trial. During the hearing, A.K.'s counsel argued DCYF had failed to disclose Wicks's recorded statement in response to A.K.'s 2019 discovery requests, including her specific request for any recorded statements made by any witnesses or parties.

A.K.'s counsel had learned of Wicks's recorded statement on October 14, 2023, after preparing Steen for his trial testimony. In response to a subpoena and public records request from A.K.'s counsel, Steen provided a flash drive containing Wicks's statement and other materials discovered in the WSP investigation. Upon opening the materials provided, A.K.'s counsel discovered the recorded statement, in which Wicks stated:

And I finally confronted him and told him, you know, I had very strong feelings what was going on with [A.K.] was absolutely inappropriate. And, you know, I said, I do not ever want to have contact with him again unless Julie was present. And he never denied anything, but he didn't say anything either. He didn't admit anything.

. . . .

Julie at that point, however, knew that there was something going on between the two of them. And - - but her approach was to attack [A.K.], not Carlos.

So I think that that gave me the - - just confirmed what I thought was going on, and it was after that time that Carlos pulled me over that I just, you know, ripped him - - ripped him up and down and said, you know, this is kind of - - protection is what I do for a living. I know that something's going on. And I was upset with Julie for going after [A.K.].

. . . .

[W]e did have a conversation and I was protective of her, of course, because I thought she was really being a victim here. And I flat out said to her: [A.K.], I know that something is going on with Carlos, and you know, it is not okay. And, you know, I am - - you know, I'm here if you need something or want to talk more about it. And she - - and again, she didn't deny anything. She didn't - - she didn't expand or anything. She was really upset.

. . . .

And she wouldn't expand much on it, but she wouldn't deny anything either . . . She was - - you know, she was being set up in a situation that was way too much for her to handle.

And I just - - the way we communicated back and forth, I was a hundred percent sure that, you know, something was - - had gone on physically between them, but I was - - I didn't know if she was, you know, being coerced by him to not say anything or if she was just completely in love with him or you know . . . the power.

. . . .

I said, I'm - - I know that there's something that has gone on or that is going on inappropriately between you and Carlos. And she was

crying, and she just kind of put her head down and she didn't - - you know, didn't - - didn't say, no. . . .

. . . .

And just her demeanor, the fact that she was so upset and that the tears were flowing, she didn't deny the letter that Julie had written regarding the whole situation. It - - you know, she was basically confirming in her non-verbal actions that something had been - - had gone on.

. . . .

I felt that she was scared. I felt that she was very confused. I think she was enamored with him. I think it was probably her first sexual partner. And not even a partner because it wouldn't have been willing. I mean, it was willing, but you know, of course, all the dynamics . . . raping somebody. I think she was scared. . . .

While A.K. had a written summary of this interview, she never had the recorded statement until just before trial.

In her discovery motion, A.K. argued DCYF should have produced the recorded statement because the "State/DCYF, though the Washington State Patrol, had actual possession of those statements." A.K. requested various remedies including monetary sanctions. DCYF opposed the motion, arguing it never had possession, custody, or control of Wicks's recorded statement because a document in the possession of WSP is not automatically in the possession of DCYF, a different state agency.

During the October hearing, DCYF's counsel argued:

It's a nice story at the beginning, all of the introductory comments. What you didn't hear is a scintilla of evidence that suggested that DCYF or, for that matter, the Attorney General's Office had copies of the recorded interviews that were made by the Washington State Patrol that were in their possession, their custody, their control. . .

DCYF has no right to obtain Washington State Patrol records on demand. . . We would need to do the same things that Plaintiff's counsel would have to do. *We would have to make a public records request and go through that process*. . .

(Emphasis added.) The trial court asked DCYF's counsel, "how far does [AGO's] duty to search for these records go?" After a colloquy on this issue, the court asked, "what is your obligation when you're doing your trial prep . . . assume you're on the same investigative trail as the plaintiff is." DCYF's counsel responded,

Do we have an obligation? Certainly I would agree, Your Honor, had we done it, had we gone to get the Washington State Patrol records, *had we made our own records request*, had we gotten these records, our client, DCYF now, through their agent, through their attorney has records, and we would be obligated to not only identify them, but if we had a records request for production, produce them. And that's consistent with some of the cases that have also been cited. . .

But the attorneys [in the other cases] already had them. The defendants' attorneys already had them. And once the attorneys have them, we have to turn them over. *That wasn't this case. We didn't have these records*.

(Emphasis added.) The court concluded that the discovery of the evidence by A.K.'s counsel was fortuitous and did not sanction DCYF or the AGO.

After the October 2023 hearing, A.K.'s counsel investigated the claims DCYF's counsel made at the hearing. This investigation revealed that a former investigator at the AGO, Laura Malane, had, in fact, made a public records request directed to WSP on March 14, 2023, seeking all records related to the Martinez criminal investigation. On April 13, 2023, WSP had messaged Malane that responsive documents were "available for her to access, review, and download." This initial response did not include Wicks's recorded statement. On April 24, 2023, Malane logged into WSP's Public Portal and viewed one of the .zip folders

to which she had been granted access, which contained a picture of a campsite. E-mails between Malane and the trial team during this time show they accessed the campsite picture but did not believe it was related to the case and concluded that WSP made an error in responding to their public records request. However, the WSP message directed to Malane advised that another installment of responsive records would be provided to the AGO on or before May 19, 2023.

Between April 25 and May 15, 2023, WSP employees uploaded several other individual files onto the portal, including the audio file that contained Wicks's recorded statement to WSP investigators in 2013. On May 15, 2023, WSP employees sent Malane an e-mail advising her "there was a final installment of responsive documents available for her to access, review, and download." This e-mail "included a link that would allow her access to the files that had been uploaded and to which she had been given access." A WSP Public Records Officer's review of the audit history revealed that "no one outside the Patrol ever accessed, opened, or viewed any of the files to which the Patrol gave Ms. Malane access on May 15, 2023." Notably, DCYF had twice supplemented its initial discovery responses on June 30 and July 13, 2023, but had never identified or produced Wicks's 2013 recorded statement made to WSP investigators.

Upon discovering this information after the October 2023 hearing and the jury's verdict, A.K. filed a motion on February 22, 2024, to vacate the judgment and for sanctions against DCYF and the AGO. The court held a hearing on the motion on February 29, 2024. During the hearing, A.K. argued DCYF had control over the recorded statement even though AGO employees never clicked on the

link provided by WSP because "[t]he idea that by not clicking on it, that's okay. It boggles the mind to think if that were in fact true." DCYF's attorney responded, "[w]e couldn't have produced it in discovery, because we didn't have it. We didn't have any special right to go get it. Maybe we could have accessed it if we had known in May of 2023 from WSP, but we can't connect those dots and neither can the plaintiff."

Ultimately, the trial court denied A.K.'s motion to vacate the judgment because it believed it could not decide the motion under RAP 7.2 while the case was on appeal.[3] The court reserved decision on the motion, and the appeal proceeded. Because the trial court's order reserving decision on the motion for discovery sanctions contravened RAP 7.2, this court entered an order vacating that ruling, remanded the matter for the trial court to fully address the merits of A.K.'s motion, and retained jurisdiction to decide the issues on appeal following disposition of the unresolved issues on remand.

On remand, A.K. no longer sought to vacate the jury's verdict or to obtain a new trial. Instead, A.K. sought only "monetary sanctions under Civil Rule 26(g)." On February 28, 2025, at a motion hearing, the court granted A.K.'s motion for sanctions and directed both parties to "provide information to the court . . . for which the court can base a monetary sanction on." In the parties' responsive briefing, both parties agreed A.K. was seeking only monetary sanctions under 26(g) and not a more severe sanction under CR 37(b). Thus, DCYF conceded the

---

[3] RAP 7.2(e) states in relevant part that if a trial court's decision regarding a postjudgment motion "will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the formal entry of the trial court decision."

trial court did not need to analyze the three *Burnet* factors that would be relevant had A.K. continued to request a severe discovery sanction such as default under CR 37(b). *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). Nevertheless, DCYF argued the court should consider the *Burnet* factors in its order because "the *Burnet* factors provide guidance, particularly where, as here, two of the factors—willfulness and prejudice—are lacking."

The trial court granted A.K.'s motion and awarded A.K. attorney fees totaling $65,762. In its order granting A.K.'s motion for sanctions, the trial court found that "DCYF failed to comply with the discovery rules with respect to the Wicks interview tape." It stated that "a party must make a 'reasonable inquiry' to acquire the materials sought from a discovery request" and that "DCYF, through the AGO, had received Ms. Wicks's recorded statements, along with other statements on May 15, 2023, and for no apparent reason, declined to turn it over to Plaintiff." After analyzing CR 34 and related caselaw, the court found it "clear" that "DCYF has 'control' over the recording of Jocelyn Wicks' interview, despite never opening, accessing, or viewing it from the online portal." The court found that having been granted access to the recording, "DCYF has the duty, in making a 'reasonable inquiry' to acquire the materials sought from discovery, to seek and produce the recording."

However, after making these findings, the court stated, "[b]ecause A.K. has withdrawn her request to vacate the order, the most severe discovery sanctions are inappropriate. Under CR 37(b), the Court must consider lesser sanctions, and in doing so, must base those sanctions on the record considering" the three *Burnet*

factors. After concluding DCYF's actions were merely negligent, and not willful or deliberate, the trial court determined that "[l]esser sanctions apply here." It awarded attorney fees relating solely to motions surrounding the Wicks statement totaling $65,762. DCYF now appeals the trial court's sanctions order, in addition to its appeal of the judgment, and A.K. cross-appeals only the sanctions order.

II

A.      DCYF's CR 50 motion regarding proof of causation

DCYF argues the trial court erred in denying its CR 50 motion because A.K "did not present substantial evidence to support proximate cause." We disagree.

Judgment as a matter of law under CR 50 is appropriate only when, construing all facts and reasonable inferences in favor of the nonmoving party, the court concludes "as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party." *Paetsch v. Spokane Dermatology Clinic, P.S.*, 182 Wn.2d 842, 848, 348 P.3d 389 (2015) (quoting *Indus. Indem. Co. of Nw. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990)). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true. *Mancini v. City of Tacoma*, 196 Wn.2d 864, 877, 479 P.3d 656 (2021). We review rulings on CR 50 motions for judgment as a matter of law de novo. *Paetsch*, 182 Wn.2d at 848.

Our courts have held that to establish negligence, a plaintiff must show duty, breach, cause in fact, legal causation, and resulting harm. *Lowman v. Wilbur*, 178 Wn.2d 165, 169, 309 P.3d 387 (2013). Washington courts have also held that both cause in fact and legal causation are encompassed within the element of

- 13 -

proximate cause. *See, e.g.*, *id.*; *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). But while our Supreme Court has recited this formulation of proximate cause, it has acknowledged the formulation is "imprecise" and "[s]ome confusion probably has been generated by the imprecise use of the term 'proximate cause' to encompass cause in fact and legal causation alone or in combination." *Hartley*, 103 Wn.2d at 778.[4]

This case illustrates the imprecision that our Supreme Court acknowledged in *Hartley*. While DCYF argues that A.K. failed to present sufficient evidence of proximate cause, the only element at issue on appeal is cause in fact, or factual causation. As explained by Washington courts, legal causation is "grounded in policy determinations as to how far the consequences of a defendant's acts should extend" and requires courts to weigh "mixed considerations of logic, common sense, justice, policy, and precedent." *M.N. v. MultiCare Health Sys., Inc.*, 2 Wn.3d 655, 664, 541 P.3d 346 (2024) (quoting *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478-79, 951 P.2d 749 (1998)). In contrast, factual causation focuses on the "but for" consequences of the defendant's act or omission. *Galassi v. Lowe's Home Ctrs.*, LLC, 4 Wn.3d 425, 440, 565 P.3d 116 (2025). DCYF purports to discuss proximate cause but does not make any argument regarding legal causation. Rather, DCYF argues that A.K. did not present evidence about "what would have happened had Wicks made a report of suspected abuse in 2004" or

---

[4] Division Two of this court has quoted this portion of *Harley*, adding, "We agree." *Channel v. Mills*, 77 Wn. App. 268, 273 n.9, 890 P.2d 535 (1995). A member of this panel has recognized this point as well, and has opined that cause in fact and legal causation are separate and distinct elements of a negligence claim rather than elements of proximate cause. *Zorchenko v. City of Federal Way*, 31 Wn. App. 2d 390, 401-04, 549 P.3d 743 (2024) (Feldman, J. concurring).

"the likely outcome of an investigation." Based on these arguments, A.K. claims DCYF disputes only cause in fact. In its reply brief, DCYF does not dispute this claim. At oral argument, DCYF's counsel similarly confirmed that the issue before us is limited to the element of cause in fact.[5]

"Cause in fact refers to the '"but for" consequences of an act—the physical connection between an act and an injury.'" *Galassi*, 4 Wn.3d at 440 (quoting *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 289, 481 P.3d 1084 (2021)). Though the plaintiff "cannot rest a claim for liability on a speculative theory," cause in fact is satisfied if the plaintiff presents circumstantial evidence that "'allow[s] a reasonable person to conclude that the harm more probably than not happened in such a way that the moving party should be held liable.'" *Martini v. Post*, 178 Wn. App. 153, 165, 313 P.3d 473 (2013) (quoting *Little v. Countrywood Homes, Inc.*, 132 Wn. App. 777, 781, 133 P.3d 944 (2006)). Thus, cause in fact presents a question generally left to the jury's determination and "may be determined as a matter of law only when reasonable minds can not differ." *Joyce v. Dep't. of Corr.*, 155 Wn.2d 306, 322, 119 P.3d 825 (2005); *Galassi*, 4 Wn.3d at 440.

Applying these legal principles here, the trial court did not err in denying DCYF's CR 50 motion for judgment as a matter of law because A.K. presented substantial evidence to support a jury's finding of causation. In her case in chief, A.K. presented testimony from Jane Ramon, an expert in the standard of care for CPS workers. Ramon testified, based on DSHS policies and procedures, that CPS workers are required to report suspected abuse so that the report can be

---

[5] Wash. Ct. of Appeals oral argument, *A.K. v. Department of Social and Health Services*, No. 86100-0-I (January 8, 2026), at 4 min., 20 sec. through 4 min., 41 sec. (on file with court).

investigated by DCYF or law enforcement. Ramon further testified that it was Wicks's obligation as a mandatory reporter to report what she knew to CPS, which would have then referred the case, which here was a "third-party case," to law enforcement for an investigation. While such a report may have gone to a few different law enforcement agencies, Ramon testified it likely would have gone to either WSP or the Sherriff's Office because the abuser in this case was a Monroe Police Department sergeant.

Critical here, Ramon testified that had a report of child abuse been made, law enforcement would have been required to investigate it. Ramon offered the following opinion on a more probable than not basis:

> Ms. Wicks knew [A.K.]; [A.K.] knew Ms. Wicks, and [A.K.] was in the midst of a very, very difficult situation, one that she could not handle at her age. And she, in my opinion, attempted to let Ms. Wicks know about that. A number of things came to light to Ms. Wicks about what [A.K.] was going through; a matter that, in my opinion, should have been reported to the Department of Social and Health Services and was not.
>
> And then that left that situation to go on and on and on for a very long period of time in a very harmful way. In my opinion, had it been dealt with in a way that it was very clearly understood had to be dealt with, in my opinion, the situation would have ceased and [A.K.] would not have gone through what she went through for a very, very long period of time.

Although the court did not allow Ramon to testify the sexual abuse would have stopped if investigated by law enforcement and sustained a speculation objection after such a question by A.K.'s counsel, the court stated it would allow A.K. to question Steen as to what procedures law enforcement would have followed in this case had it been investigated in 2004.

Consistent with the trial court's evidentiary ruling, A.K. presented testimony of Steen regarding law enforcement's investigative process. Steen testified he had been involved in hundreds of criminal police investigations and that the basic investigative process had not changed from 2003 and 2004 to 2012. Specifically, Steen testified that if a case like this had come up in 2004,

> We consider this a live-victim case, and when we get a call or information on a live victim, we drop everything we're doing within the task force and we move heaven and earth to make sure that that child is no longer being abused. We do everything we can to do that, which would include taking custody of the child, putting them in the case of a close family member or safe location, or CPS placement, and then we continue on with investigation at that point in time. We do nothing else with that case. They become the absolute priority.

Steen testified that, once a report is made, the investigation would begin "[t]he second we hang up the phone call." He further testified that if the suspect involved is a police officer, the investigation is sped up because of law enforcement's concern "to make sure they're not out there doing that kind of stuff or hurting the public as a whole." Steen concluded that had "a case like this come[] into [his] office in 2004," law enforcement would have followed the same various steps of the investigation as they did during the 2012 investigation, regardless of whether the victim is cooperative with law enforcement, including interviewing witnesses, obtaining search warrants, and collecting evidence, to "turn heaven and earth over to find out what happened."

Viewed in the light most favorable to A.K., this evidence was sufficient to persuade a fair-minded, rational juror that Wicks's failure to report A.K.'s sexual abuse was a cause in fact or "but for" cause of A.K.'s injury. As the trial court correctly noted in its discussion with counsel, "whatever inference the jury wants

to take from [the testimony] the jury can take from [the testimony]." In *Conrad v. Alderwood Manor*, the court held that a "plaintiff need not establish causation by direct and positive evidence. She need only show by 'a chain of circumstances from which the ultimate fact required is reasonably and naturally inferable.'" 119 Wn. App. 275, 281, 78 P.3d 177 (2003) (quoting *Attwood v. Albertson's Food Ctrs., Inc.*, 92 Wn. App. 326, 331, 966 P.2d 351 (1998)). A.K. presented such a "chain of circumstances" here, starting with Wicks's breach of her duty to report and ending with law enforcement's required investigation and investigative procedures, from which the jury could reasonably find the element of factual causation satisfied. That was sufficient to survive DCYF's CR 50 motion.

Despite this, DCYF argues the jury was left to speculate about causation because Ramon offered "very little reliable evidence," Ramon's opinions were conclusory and unsupported by facts, and Steen's testimony was "generalized." For example, DCYF claims Ramon's opinions cannot support the jury's finding of causation because the trial court did not allow Ramon to testify whether "if this was reported to law enforcement and investigated . . . the sexual abuse would have stopped." But DCYF's arguments ignore the testimony discussed above from which the jury could reasonably infer causation. As our Supreme Court has noted, "crediting reasonable inferences is the stuff of juries, which is why courts generally leave questions of breach and causation for juries to decide." *H.B.H. v. State*, 192 Wn.2d 154, 182, 429 P.3d 484 (2018). Additionally, DCYF's argument that A.K.'s evidence was not "reliable" ignores the applicable legal standards. By filing a CR 50 motion for judgment as a matter of law, DCYF "admits the truth of [A.K.]'s

- 18 -

evidence and all inferences which can reasonably be drawn [from it]." *Faust v. Albertson,* 167 Wn.2d 531, 537, 222 P.3d 1208 (2009) (citing *Davis v. Early Constr. Co.*, 63 Wn.2d 252, 254, 386 P.2d 958 (1963)). Thus, the trial court did not err in denying DCYF's CR 50 motion for judgment as a matter of law and leaving the question of causation for the jury's determination.

B.      CR 26(g) discovery sanctions

Turning to the trial court's post-trial ruling awarding monetary sanctions against DCYF and the AGO based on their failure to timely disclose and produce Wicks's recorded statement to WSP, A.K. argues the award should be vacated and the issue should be remanded because the trial court applied the incorrect legal standard in assessing sanctions. DCYF, in contrast, argues the trial court erred in concluding it violated the applicable discovery rules. We agree with A.K. and disagree with DCYF. But despite the trial court's application of an erroneous legal standard, we affirm the trial court's award because the error was harmless.

CR 26 governs the discovery sanctions at issue here. Under CR 26(g), attorneys responding to discovery requests must certify they have read the response and after a "reasonable inquiry" believe it is consistent with the discovery rules. "Whether an attorney has made a reasonable inquiry is to be judged by an objective standard." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 343, 858 P.2d 1054 (1993). "Subjective belief or good faith alone no longer shields an attorney from sanctions under the rules." *Id.* Additionally, CR 26(g) states:

> If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, *shall* impose upon the person who

made the certification, the party on whose behalf the request . . . is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.

(Emphasis added). Thus, if "a violation is found . . . sanctions are mandated." *Fisons*, 122 Wn.2d at 346. "[I]ntent need not be shown before sanctions are mandated." *Id.* at 345. In determining what sanctions are appropriate under CR 26(g) to fulfill their purpose "to deter, to punish, to compensate and to educate," the trial court considers the least severe sanction that will "insure that the wrongdoer does not profit from the wrong" and "will be adequate to serve the purpose of the particular sanction." *Id.* at 355-56. "The sanction must not be so minimal, however, that it undermines the purpose of discovery." *Id.* at 356.

In contrast, CR 37(b)(2), a related but distinct court rule regarding discovery, authorizes a trial court to impose sanctions for discovery violations "as are just." CR 37(b)(2) provides a nonexhaustive list of remedies including severe sanctions such as dismissal, default, and exclusion of testimony. Additionally, CR 37(b)(2) also mandates the imposition of monetary sanctions for violations of this discovery rule. When a trial court imposes one of the harsher remedies under CR 37(b)(2)(A)-(E), the record must demonstrate the trial court explicitly considered the so-called *Burnet* factors: (1) whether a lesser sanction would probably have sufficed, (2) whether it found the discovery violation willful or deliberate, and (3) whether the discovery violation substantially prejudiced the opponent's ability to prepare for trial. *Burnet*, 131 Wn.2d at 494 (citing *Snedigar v. Hodderson*, 53 Wn. App. 476, 487, 768 P.2d 1 (1989)).

Where a trial court awards monetary sanctions under CR 26(g), as the trial court did below, the *Burnet* factors are inapposite. *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 132 P.3d 115 (2006), is controlling on this point. There, the trial court imposed monetary sanctions against Sto Industries to compensate the Mayers for Sto Industries' discovery violations. *Id.* at 682-83. The court of appeals reversed, holding the trial court erred by not considering the three *Burnet* factors because the "'*Burnet* rationale applies equally and is required under either [CR 26(g) or CR 37(b)(2)].'" *Id.* at 688-89 (quoting *Mayer v. Sto Indus., Inc.*,123 Wn. App. 443, 455, 98 P.3d 116 (2004)). Our Supreme Court reversed the court of appeals and reinstated the trial court's sanction award, holding that consideration of the *Burnet* factors applies only to awards of severe sanctions under CR 37(b)(2). *Id.* at 690, 695. It explained the "three-part test" under *Burnet* is only triggered by a request for one of the harsher remedies allowable under CR 37(b)(2), such as the exclusion of testimony, dismissal, and default, that affect a party's ability to present its case. *Id.* at 689-90. Thus, the *Burnet* factors "have no applicability" in a trial court's determination of sanctions under either CR 26(g) or less severe remedies, such as monetary sanctions, under CR 37(b)(2). *Id.* at 689.[6]

While this court reviews a trial court's decision regarding discovery sanctions for abuse of discretion, *Blair*, 171 Wn.2d at 348, a trial court abuses its discretion where, as here, it applies an incorrect legal standard, *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009). The trial court correctly began its

---

[6] *Accord Blair v. Ta-Seattle E. No. 176*, 171 Wn.2d 342, 349, 254 P.3d 797 (2011) ("*Mayer* clearly held that trial courts do not have to utilize *Burnet* when imposing *lesser* sanctions, such as monetary sanctions, but must consider its factors before imposing a harsh sanction such as witness exclusion").

- 21 -

analysis of CR 26(g) by finding that DCYF failed to make a reasonable inquiry that its discovery responses were consistent with the discovery rules. But it then analyzed the *Burnet* factors, finding DCYF's actions were neither willful nor deliberate and concluding that "[l]esser sanctions apply here." *Mayer* clearly dictates the trial court's analysis of the *Burnet* factors was in error. *See* 156 Wn.2d at 689 ("the *Burnet* test . . . should have no applicability" to a "sanctions motion . . . brought under CR 26(g)"). Like the court of appeals' incorrect analysis in *Mayer* that considered "the *Burnet* rationale" in the context of monetary sanctions, the trial court here engaged in an incorrect legal analysis in determining monetary sanctions under A.K.'s CR 26(g) motion. Thus, the trial court abused its discretion.

DCYF's corresponding arguments are unpersuasive. First, DCYF argues the trial court's order was predicated on the updated version of CR 26(e) that was not in effect in May of 2023 which led the trial court to erroneously conclude DCYF engaged in a discovery violation. This argument lacks merit. After this court ordered the trial court to fully address A.K.'s motion to vacate, A.K. clearly amended her request on remand and sought "only . . . monetary sanctions under Civil Rule 26(g)." Both parties agreed below that "Plaintiff is only seeking monetary sanctions under Civil Rule 26(g)." Additionally, the trial court's order granting A.K.'s motion for sanctions under CR 26(g) reflects its finding that DCYF violated CR 26(g): "DCYF has the duty, in making a 'reasonable inquiry' to acquire the materials sought from discovery, to seek and produce the recording" and "DCYF failed to comply with the discovery rules with respect to the Wicks interview tape." This finding is amply supported by the record. After DCYF obtained control of

Wicks's recorded statement in May 2023, DCYF's counsel twice certified discovery responses which improperly disregarded the Wicks statement without conducting a "reasonable inquiry" to ensure they had provided all responsive documents to A.K. DCYF's novel argument on appeal that the trial court's singular mention of CR 26(e) demonstrates its order was not based on a violation of CR 26(g) is thus unpersuasive.

Second, DCYF argues it did not violate CR 26(g) because it supplemented its responses only to A.K.'s interrogatory no. 1 and request for production no. 1, thus certifying only those responses. DCYF's argument is unpersuasive. In 2019, A.K. served her first discovery requests which included interrogatory no. 14 requesting "any written and/or recorded statements made by any witnesses." DCYF responded, "[t]here are no presently-known written or recorded statements in the possession of DCYF, made by any person known to have been a witness to any of the events allegedly relating to this case." Then, DCYF supplemented its original responses to A.K.'s discovery request after it was granted access to Wicks's recorded statement through the patrol's public portal on May 15, 2023. While the additional information DCYF disclosed in June and July of 2023 related to expert testimony directly in response to interrogatory no. 1 and request for production no. 1, DCYF included its original responses to interrogatory no. 14 in both supplemental responses and, critical here, certified that "[t]he undersigned attorney has read the foregoing answers and responses to these discovery requests, and they comply with CR 26(g)." The unambiguous meaning of "foregoing answers" includes DCYF's response to interrogatory no. 14. Yet

despite that discovery request, neither supplemental discovery response disclosed Wicks's recorded statement. On this record, the trial court did not abuse its discretion in concluding DCYF and the AGO violated CR 26(g)'s requirement that counsel conduct a "reasonable inquiry" to ensure their responses are consistent with the applicable discovery rules.

Lastly, DCYF argues the trial court applied the incorrect standard for determining "control" for discovery purposes because it focused on DCYF's "access" to Wicks's recorded statement and not on whether DCYF had the legal right to obtain the statement. DCYF incorrectly interprets Washington precedent defining "control." Under CR 34(a), a party must produce documents that are in their "possession, custody, or control," and Washington courts have defined "control" under CR 34(a) as *either* "the legal right to obtain the documents requested upon demand" *or* as "access to and the ability to obtain the documents." *Diaz v. Wash. State Migrant Council*, 165 Wn. App. 59, 78, 265 P.3d 956 (2011). Here, the trial court found that "DCYF has the legal right to the recording in the online portal, having filed a public records request and being granted access to it." Under *Diaz*, the record clearly supports the trial court's determination because DCYF "ha[d] access to the online portal" and "the ready ability to obtain the recording" "simply by downloading it." Indeed, in briefing to the trial court on this issue, DCYF conceded its attorneys were "technically granted 'access'" to the recorded statement, though they never downloaded it from the online portal. Thus, DCYF's argument that the trial court applied the incorrect standard for determining "control" under CR 34(a) fails.

DCYF relies on *Searock v. Stripling*, 736 F.2d 650 (1984), in arguing it never had control over Wicks's statement because it had no legal right to obtain the statement. This reliance is misplaced. In *Searock*, Stripling had told opposing counsel that he could obtain certain vessel repair records from the repair shops that possessed them but when he requested the records the repair shops did not provide all of the requested documents. *Id.* at 651-52. The trial court awarded opposing counsel an extreme sanction, dismissing Stripling's counterclaim, because he had failed to produce all the repair documents. *Id.* at 652-53. The Eleventh Circuit reversed, noting that even though Stripling had requested the documents and expected to receive them, he did not have the legal right to obtain them on demand. *Id.* at 654. Thus, the court concluded the record did not demonstrate that "Stripling asserted 'control' over the documents in the sense required for production under Rule 34." *Id.* Here, in contrast, when DCYF requested all records related to the Martinez criminal investigation, WSP *did provide* DCYF with Wicks's recorded statement. Once DCYF was given access to the statement through the online portal, it had the right and the ability to obtain it and thus had control over it. As such, *Searock* is inapposite here.

Having concluded that the trial court applied an incorrect legal standard but did not otherwise abuse its discretion in awarding sanctions under CR 26(g), we turn to the amount of sanctions awarded, which A.K. argues would have been greater absent the court's erroneous application of the *Burnet* factors. Under the *Burnet* framework, trial courts are to consider, among other relevant circumstances, "whether a lesser sanction would probably have sufficed." 131

Wn.2d at 494. Similarly, under CR 26(g), trial courts are to impose a sanction that is "severe enough to deter." *Fisons*, 122 Wn.2d at 356. In both circumstances, sanctions must be sufficient but not excessive. Here, while the trial court applied the wrong test, it nonetheless determined an appropriate sanction—sufficient but not excessive—by expressly limiting its analysis to the "material from the Wicks interview tape and the subsequent motions surrounding the Wicks materials." Accordingly, while the court abused its discretion in applying *Burnet*, the error was harmless.

Affirmed.

_____
Feldman, J.

WE CONCUR:

_____      _____
Birk, J.                      Coburn, J.